UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

BRANDON WOLGAST,

                Plaintiff,                          Case No. 15-cv-10495

v.                                          Honorable Thomas L. Ludington

TAWAS AREA SCHOOL DISTRICT
BOARD OF EDUCATION, et al.,

                Defendants.

_____/

**ORDER SUSTAINING IN PART AND OVERRULING IN PART OBJECTIONS, ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION, AND DENYING MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff Brandon Wolgast initiated this case against Defendants Tawas Area School District Board of Education, Jeffrey Hutchison, Anne Freel, and Connie O'Connor on February 6, 2015. See Pl.'s Compl., ECF No. 1. Seventeen days later, Wolgast amended his complaint and filed a motion for preliminary injunctive relief. *See* Pl.'s Am. Compl., ECF No. 7; Pl.'s Mot. Prelim. Inj., ECF No. 8. Wolgast's Amended Complaint alleges eight grounds for relief, including: (1) violation of Due Process; (2) unlawful retaliation under the First Amendment; (3) unlawful retaliation under the Michigan Whistleblower Protection Act; (4) improper nonrenewal of his contract in violation of Michigan law; (5) improper termination without a school board vote in violation of Michigan law; (6) violation of the Michigan Open Meetings Act; (7) unlawful creation of public policy without the vote of a school board; and (8) violation of the Michigan Open Meetings Act by failing to keep proper meeting minutes.

In conjunction with his Amended Complaint, Wolgast filed a motion for preliminary injunctive relief based on the first three counts of his complaint. See Pl.'s Mot. Prelim. Inj., ECF

No. 8. All pretrial matters in this case were referred to Magistrate Judge Patricia T. Morris. See ECF No. 3. Judge Morris issued a Report & Recommendation on Wolgast's motion for a preliminary injunction on April 13, 2015. See Rep. & Rec., ECF No. 20. She recommended that Wolgast's motion be denied. *Id*. Wolgast timely objected to the Report. See Pl.'s Objs., ECF No. 22. Wolgast's objections to Judge Morris' Report will be addressed.

## I.

Plaintiff Brandon Wolgast is a citizen of the City of Tawas and, until December 31, 2014, was a Technology Support Specialist in the Tawas Area School District ("District"). Defendant Tawas Area School District Board of Education ("Board") is the administrative entity tasked with overseeing and directing the District. Defendant Jeffrey Hutchison is the Superintendent of the District. Defendant Anne Freel is the President of the Board and Defendant Connie O'Connor is the Board's Vice President.

## A.

The Board hired Wolgast in March 2011 to the position of Technology Technician. Pl.'s Am. Compl. ¶ 11., ECF No. 7. On December 18, 2014, Wolgast and the Board entered into an employment contract commencing January 1, 2014 and ending December 31, 2014. Pl.'s Mot. Prelim. Inj., Ex. B, ECF No. 8-3. The contract provided for at will termination as long as either party provided thirty days' written notice to the other party. *Id*. Nothing in the contract outlined procedures for renewal. There was also nothing in the contract indicating that Wolgast was considered an administrator or possessed administrative duties. Indeed, the word administrator or any variant thereof appears nowhere within the contract.

## B.

In 2013, the current District Superintendent convened an informal committee of Tawas Area School District employees. Defs.' Answer ¶ 14, ECF No. 11. The committee's primary goal was to increase and improve the use of technology in the school district's curriculum. *Id.* at ¶ 15. Wolgast and the three individual defendants were members of this committee. Pl.'s Am. Compl. ¶16.

One of the initiatives explored by the committee was a one-to-one program. Defs.' Answer ¶ 16. A one-to-one program provides each student in the program (generally a whole school or district) with his or her own computing device. These programs take many different forms usually varying individual students' access to their devices. Some programs allow students to take the devices home others do not and still others provide a second, more limited device for the students' home use. Pl.'s Am. Compl. ¶ 16.

During the course of exploring a one-to-one program that could be implemented in the District, members of the technology committee visited schools in Traverse City that employed a one-to-one program. *Id.* at ¶17. Defendants Hutchison and O'Connor and Wolgast were part of the group that visited Traverse City. *Id.* Traverse City employs a one-to-one program that permits high-school students to take home the laptop computers that they use in school. *Id.*

According to Wolgast, after the visit to the Traverse City School District, he "sought quotes and prepared a detailed proposal showing exactly how a grade 9-12, take-home version of a one-to-one program could be implemented in the District as early as the 2014-2015 school year." *Id.* at ¶ 18. Wolgast then presented his ideas to Tawas High School Principal Eric Diroff and Superintendent Hutchison, who at that time was an elementary-school principal. *Id.*

"[A] $9.72 million bond was passed by Iosco County voters on November 4, 2014[.]" Defs.' Answer ¶ 20. The bond included a $500,000 appropriation for "instructional technology."

*Id.* Superintendent Hutchison reached out to School Board President Freel on October 21, 2014 concerning the possible implementation of a one-to-one program. Defs.' Answer ¶ 21. In response to that email and shortly after the Iosco County bond passed, Board President Freel responded to Superintendent Hutchison's email by expressing a desire to reconstitute the technology committee. Pl.'s Am. Compl. ¶ 21. The committee would explore implementing the one-to-one program with the bond proceeds earmarked for institutional technology.

### C.

The committee was officially reconstituted by Board President Freel at a Board meeting on November 10, 2014. *Id.* at ¶ 23. The reconstituted committee consisted of Board President Freel, Board Vice President O'Connor, Board Member Jim Bacarella, and Superintendent Hutchison. *Id.* The Board scheduled a meeting for the new technology committee on November 19, 2014 at 5:30 p.m. *Id.* at ¶ 24. Superintendent Hutchison asked that Middle School Principal Peter Newman, High School Principal Eric Diroff, Curriculum Director Stacey Mochty, and Technology Support Specialists Ben Kendra and Wolgast attend the technology meeting. *Id.*

### 1.

The technology meeting was held as planned and all members of the newly constituted technology committee were in attendance, except for Board President Freel. Pl.'s Am. Compl. ¶ 26. All individuals invited to the meeting by Superintendent Hutchison were present. *Id.* At the meeting, each person in attendance explained his or her view of what the proposed one-to-one program should look like. *Id.* at ¶¶ 28-28g. According to Wolgast, he was particularly vocal in expressing details and designs for the one-to-one program. *Id.* at ¶ 28g. He also expressed concerns about the expense of certain one-to-one program proposals and, more generally, the fiscal well-being of the district. *Id.* at ¶ 29. Wolgast went on to question how the technology

committee would settle on a proposal to present to the whole Board in light of the fact that committee members had different views of how the program should be implemented. *Id*. at ¶ 31. He then offered suggestions to the committee for how it should operate and how a vote on the program should be held.

Wolgast contends that the new technology committee agreed with his suggestion for resolving the conflicts by voting on a new program. *Id*. at ¶32. He also contends that pursuant to his suggestions, the new technology committee planned a meeting of the older, larger technology committee to be held on December 10, 2014. *Id*. Further, Wolgast claims that the technology committee tasked him with administering a "student survey to find out exactly what technology students had access to at home." *Id*. at ¶34.

**2.**

Wolgast claims that shortly after the November technology meeting the Board took swift and decisive steps in implementing the one-to-one program. *Id*. at ¶¶ 35-43. Part of these steps involved moving the previously scheduled December 10, 2014 meeting to December 3, 2014. Id. at ¶ 45. Furthermore, the survey of the students' home technology was cancelled. *Id*. at ¶44.

On the morning of December 3, 2014, Superintendent Hutchison emailed Wolgast and his co-worker, Technology Support Specialist Ben Kendra asking them to attend the technology committee meeting that night. Defs.' Answer ¶ 47. Superintendent Hutchison indicated that their attendance at the meeting was very important. *Id*.

Wolgast attended the December 3, 2014 meeting and brought with him a newly acquired electronic reading device as well as an electronic reading device already owned by the district.[1] Pl.'s Am. Compl. ¶¶ 49, 51. "Wolgast intended to demonstrate those devices and to present his

---

[1]   Presumably, although Wolgast's complaint is not clear, the new electronic reader was acquired with the District's technology budget.

ideas and explain how his ideas would meet all of the needs expressed at the previous [November 19, 2014] meeting." *Id*. at ¶ 51. At the meeting, Wolgast and Ben Kendra were informed by the technology committee "that an administrative decision had been reached to move forward with a one-to-one technology program that involved sending laptops home with students in grades 9-12, with the goal of implementing the program by fall 2015." Defs.' Answer ¶ 52.

Wolgast claims that he was asked directly whether he could have the one-to-one program up and running by fall 2015. Pl.'s Am. Compl. ¶ 53. In response to this question Wolgast set in on a series of his own questions, including a question about the terms of his own employment. *Id*. Wolgast was told that his questions were not important to the task of the committee at that time. *Id*. At the close of the meeting Wolgast went on to inquire about the December 10, 2014 technology committee meeting and was told that it was cancelled. *Id*. at ¶ 55. Board President Freel scheduled a follow-up technology committee meeting for December 18, 2014 at which point she expected Wolgast to conduct preliminary tests of one-to-one technology and present his findings to the committee. *Id*. at ¶56. Wolgast states that he spent the next few days purchasing and testing technology related to the planned one-to-one program. *Id*. at ¶ 57.

On December 8, 2014, a staff meeting was held by Superintendent Hutchison at which Wolgast, a number of administrative personnel, and district teachers were present. Id. at ¶ 62. At that meeting, teachers raised concerns regarding the one-to-one program that the technology committee was planning on presenting to the board. *Id*. at ¶63. Wolgast independently raised the point that the decision on the program was not final until it was approved by the Board. *Id*. at ¶ 65.

Later that night, a full Board meeting was held. Id. at ¶66. Wolgast attended the meeting. *Id*. During the meeting there was a public comment period, but Wolgast did not speak during the allotted time. *Id*. Wolgast asserts that no vote was held on the technology committee's one-to-one proposal, despite it being discussed. *Id*. at ¶67.

**D.**

Late at night on December 8, 2014, after the Board meeting, Wolgast sent an email to Superintendent Hutchison. *Id*. at ¶ 68. The email requested a meeting with Superintendent Hutchison the following day and included a three page attachment that contained more details about Wolgast's proposed topics of discussion. Pl.'s Mot. Prelim. Inj., Ex. H, ECF No. 8-9. Superintendent Hutchison did not meet with Wolgast the next day.

The attachment to Wolgast's email was a three page, single-space letter detailing a number of issues Wolgast has with his employment. *Id*. In the letter Wolgast acknowledges that his "contract is up in about 3 weeks[.]" *Id*. He then makes a series of demands related to his current and future employment conditions including: (1) an increasing in job title to administrator, (2) an increase in salary, (3) merit pay, (4) a limitation on yearly hours worked, (5) assurances of help during the summer, (6) assurances that he can participate in selecting the location for technology offices, and (7) discretion to determine what computer labs in the District should close and what labs should stay open. After making those demands, Wolgast proceeds to address the one-to-one program. He states in the letter that he is "somewhere between being highly skeptical and outright against" developments related to the one-to-one program's implementation and the program itself.[2] *Id*. Wolgast also addresses the technology committee,

---

[2]    Wolgast ends his sentence after "outright against." The sentence as it reads in full states: "I'm sure its no secret that I'm somewhere between being highly skeptical and outright against." (sic throughout). Wolgast argues in his Objections that his opposition is not the one-to-one program itself, or even certain aspects of it.

noting that he objects to the manner in which it operates. He closes his discussion of the one-to-one program by stating:

> Bottom line is this – if the district wants a successful one-to-one program, I'm willing to drop my objections to the take-home laptops and re-adjust my attitude to a more positive one, but the board must be willing to compromise with me, because I feel that I'm conceding a LOT here by accepting the responsibility of trying to manage such a program.

*Id*. (sic throughout).

## E.

Two days later, Superintendent Hutchison forwarded Wolgast's email to Board President Freel. Pl.'s Am. Compl. ¶ 75. Shortly thereafter, the two had a discussion concerning the renewal of Wolgast's contract. *Id*. During that conversation, Wolgast alleges that "a preliminary decision to not renew Wolgast's contract was made." *Id*. Hutchison then scheduled "an admin [sic] meeting" for the next morning. *Id*. Wolgast was not invited to this "admin" meeting. At the meeting, Hutchison informed the other administrators that Wolgast's contract would not be renewed. *Id*.

A meeting of the Board's personnel committee had been scheduled for 6:00 p.m. on the night of December 10, 2014. Id. at ¶ 77. In anticipation of that meeting, Board President Freel requested that Superintendent Hutchison print three copies of Wolgast's email and bring it to the committee meeting. Id. Wolgast attended the meeting but there was no discussion regarding his contract status, despite an agenda item titled "Update on Brandon Wolgast." Id. at ¶ 78. When Wolgast inquired about his contract he was told by Hutchison that discussions about contracts have ended. Id. at ¶ 79. Wolgast claims that Defendants remained after the end of the meeting and "met in secret . . . to discuss and finalize the nonrenewal of Wolgast's contract." Id. at ¶80.

The next morning, Superintendent Hutchison visited Wolgast in his office and informed Wolgast that his contract would not be renewed. *Id*. at ¶¶ 81-82. Superintendent Hutchison

placed Wolgast on immediate paid administrative leave until his contract expired on December 31, 2014. *Id*. In addition, Superintendent Hutchison told Wolgast that he could appeal the nonrenewal decision but that the personnel committee did not have to hold a hearing on his appeal. *Id*. at ¶ 86.

On December 18, 2014, Wolgast presented two internal complaints to Principal Diroff. Both complaints alleged the unlawful acts that Wolgast now alleges in his complaint. *Id*. at ¶ 91. The internal complaints also requested renewal of Wolgast's contract. *Id*. Wolgast's contract was not renewed in response to these allegations and Wolgast's employment with the District was never reinstated.

## II.

The test for whether a preliminary injunction should be granted is settled law. A district court must weigh the following factors in reaching its decision:

> (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.

*Am. Civil Liberties Union of Kentucky v. McCreary Cnty., Kentucky*, 354 F.3d 438, 445 (6th Cir. 2003) *aff'd sub nom. McCreary Cnty., Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 125 S. Ct. 2722, 162 L. Ed. 2d 729 (2005) (quoting *Rock and Roll Hall of Fame & Museum, Inc. v. Gentile Prods.*, 134 F.3d 749, 753 (6th Cir. 1998)). A district court must balance these factors, as no factor is a prerequisite to the issuance of a preliminary injunction. *Overstreet v. Lexington-Fayette Urban County Government*, 305 F.3d 566, 573 (6th Cir. 2002). "A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Id*. "[T]he proof required for the

plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion[.]" *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000).

### III.

Wolgast seeks preliminary injunctive relief that reinstates him in his position as a technology specialist for the Tawas Area School District. Although Wolgast filed an eight-count complaint he only alleges that three of those counts would support the issuance of a preliminary injunction. Those counts are as follows: (1) violation of 42 U.S.C. § 1983 because his non-renewal violated his *Loudermill* rights; (2) unlawful retaliation in violation of the First and Fourteenth Amendments; (3) unlawful retaliation under Michigan's Whistleblower's Protection Act. *See* Pl.'s Mot. Prelim. Inj., ECF No. 8. Judge Morris found that none of those counts supported the issuance of preliminary injunctive relief.

Wolgast objects to Judge Morris' conclusions and has filed eleven different objections to the Report. They are considered below.

### A.

Wolgast's first objects that Judge Morris' report "erroneously applied the Pickering balancing test to facts and information allegedly not known to [Superintendent] Hutchison at the time he made his preliminary decision to not recommend renewal of Wolgast's contract." Pl.'s Objs. 3, ECF No. 22. Wolgast contends that Superintendent Hutchison had already decided on a course of action regarding Wolgast's contract before Superintendent Hutchison read Wolgast's December 8, 2014 email on December 10, 2014. Judge Morris' determination that Superintendent Hutchison would have taken an ill-view of Wolgast's email does not square with the timeline of his decision making process.

Wolgast's objection is misplaced. As Wolgast concedes and as is evident from Superintendent Hutchison's affidavit, his determination that Wolgast's contract should not be renewed was only *preliminarily* made prior to December 10, 2014. *See* Defs.' Resp., Ex. A ¶ 29, ECF No. 15-2 ("Even before I read that email on December 10, 2014, I had reached a preliminary decision not to recommend renewal of Mr. Wolgast's contract for 2015[.]"). Superintendent Hutchison explained that this preliminary determination was based on Wolgast's "frequent and recurring opposition to the one-to-one technology initiative and the take home [sic] program, and what [Superintendent Hutchison] perceived as [Wolgast's] reluctance to work with me and the administration in achieving [their] goals on technology." *Id.* A 'preliminary determination' is far different from a 'final determination' and there is no evidence in Superintendent Hutchison's affidavit, or elsewhere in the record, that Superintendent Hutchison did not consider Wolgast's email in reaching his final decision. The statement relied upon by Judge Morris, and with which Wolgast takes issue, reflects only that Superintendent Hutchison was already considering nonrenewal before reading the email. Superintendent Hutchison confirms in his affidavit that Wolgast's December 8, 2014 email contributed to his decision. He notes that "[o]n December 10, 2014, [he] formally presented [his] recommendation [of nonrenewal] to the Board's Personnel Committee" and "[d]uring this meeting, [he] also shared Mr. Wolgast's December 8, 2014, email and attached letter." *Id.* at ¶ 30 (sic to punctuation). Thus, Wolgast's argument that Superintendent Hutchison's "decision could not have been based on the contents of the email or the attachment" is meritless.

Wolgast may argue in the alternative that Superintendent Hutchison's comments regarding a preliminary decision on Wolgast's renewal show that it was Wolgast's allegedly protected speech and only his allegedly protected speech that led to his nonrenewal. His email,

which he does not contend was protected speech, only cemented a process already set in motion by his protected speech. Even if this is Wolgast's contention, it is still meritless. Judge Morris did not consider Wolgast's email when conducting the first step of the *Pickering* test for public employees: whether his speech touched on matters of public concern. *See Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir. 2000). When analyzing the first prong of the *Pickering* framework Judge Morris rightly focused on only Wolgast's comments during the November 19 and December 3, 2014 public meetings. Judge Morris only considered Wolgast's email when analyzing the second step in the *Pickering* framework for public employees: whether "the employee's interest 'in commenting upon matters of public concern' . . . outweigh[s] 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Id*. (quoting *Pickering v. Board of Educ.*, 391 U.S. 563, 568 (1968)).

Judge Morris found that Wolgast's email, combined with his public comments and his role in the technology department, raised concerns about his professional ability to perform duties associated with implementing the program. Wolgast's statements in the December 8, 2014 email, when placed beside his comments at the November 19 and December 3, 2014 meetings, indicate a likelihood that his statements would "impede the  . . . proper performance of his daily duties . . . or . . . have interfered with the regular operation of the schools generally." *Pickering*, 391 U.S. at 572-73. In this respect, Wolgast's email was properly considered. His objection will be overruled.

## B.

Wolgast next objects to Judge Morris' representation of certain statements Wolgast made in his December 8, 2014 letter to Superintendent Hutchison. Wolgast claims that Judge Morris inserted bracketed text into his letter that fundamentally changed the meaning he was attempting

to convey. The statement in question from Wolgast's letter is the first sentence under the bolded heading "Now on to the one-to-one program[.]" Pl.'s Mot., Ex. H at 4, ECF No. 8-9. That sentence, unedited, reads: "I'm sure its no secret that I'm somewhere between being highly skeptical and outright against." *Id.* [sic to grammar]. Judge Morris added bracketed text to the sentence as follows: "I'm sure it[']s no secret that I'm somewhere between highly skeptical and outright against [certain aspects of the one-to-one program]." Rep. & Rec. 16, ECF No. 20. Wolgast claims that

> the insertion of the phrase 'certain aspects of' adds specificity to the letter that was not there and completely changes the focus of Wolgast's statements from that of the secretive methods by which Wolgast was suggesting the Technology Committee was moving forward with the program as a whole to that of the actual details of the program itself.

Pl.'s Objs. 5, ECF No. 22.

This suggestion does not square with the plain language of his letter. The sentence that was edited by Judge Morris was left ambiguous insofar as it does not contain a subject. The subject, however, can only reasonably be read to be the one-to-one program itself. If anything, Judge Morris' edits to Wolgast's letter cast his opposition to the program in a less critical light than could reasonably be assumed by limiting his objections to "certain aspects of" the program, rather than the program as a whole. Wolgast's attempt to redirect his objections from the program to the operation of the committee is not supported by his letter, which, he rightly points out, speaks for itself. Wolgast's objection is without merit and will be overruled.

## C.

Third, Wolgast makes a comprehensive objection to the Report's conclusion that his speech would not be protected under Pickering because the balancing test is unlikely to weigh in his favor. Pl.'s Objs. 6, ECF No. 22. Wolgast contends that the Report

> . . . did not lay a proper foundation for its conclusion that Wolgast made comments which could "meaningfully interfere with the performance" of his duties, "undermine a legitimate goal or mission" of his employers, "create disharmony among co-workers, impair discipline by superiors," and "destroy the relationship of loyalty and trust required of confidential employees[]" or cause his employers to fear that he would be unable to implement or possibly even would undermine the one-to-one program[.]

Pl.'s Objs. 6, ECF No. 22 (quoting Rep. & Rec. 17, ECF No. 20) (internal quotation marks omitted). Wolgast lists six different conclusions reached by the Report and addresses them individually. Those conclusions, according to Wolgast, are that his comments could:

a)   interfere with the performance of Wolgast's duties,

b)   undermine a legitimate goal or mission of Wolgast's employers,

c)   create disharmony among co-workers,

d)   impair discipline by Wolgast's superiors,

e)   destroy the relationship and trust required of confidential employees,

f)   cause his employers to fear that he would be unable to implement the one-to-one program or that he may even undermine the program.

*Id*. at 6-7. Each of Wolgast's arguments regarding these points will be taken individually.

## 1.

Wolgast believes that the Report erroneously concluded that his comments could interfere with the performance of his duties. He argues that this conclusion is incorrect because of the purchase receipts he has furnished. These receipts, he claims, which relate to purchases made after his complaints, demonstrate that he "[n]ever did anything other than what he was told to do." Id. at 7.

The receipts do not prove that point. As an initial matter, Wolgast confuses where the burden lies at this stage of proceedings. He claims that the receipts show Defendants have not proven Wolgast will not do what he is told.  But it is not Defendants' burden to carry. Wolgast

bears the burden of proof at this stage and receipts for a few technology-related items do not establish that he would not have any difficulty performing his duties following his comments.

Furthermore, the root of Wolgast's objection is that his December 8, 2015 letter to Superintendent Hutchison was taken out of context by Judge Morris. He argues that the letter, despite speaking for itself, must be considered in a broader context. Technology purchases three days before his letter was drafted to Superintendent Hutchison provides no context for determining whether his comments reflect a reluctance to perform his professional duties once those duties are expanded to include the rollout of a program he opposes.

**2.**

Next, Wolgast argues that his comments cannot be said to undermine a legitimate goal or mission of his employers if the goal or mission of the employers is not legitimate. Wolgast points out that his comments attempted to impugn the legitimacy of the decision-making process employed to decide on the one-to-one program. Wolgast also explains that he seeks a determination from this Court that the one-to-one program was not a legitimate goal or mission of the School Board. Wolgast offers no authority beyond his personal opinion that a school board implementing a district-wide technology policy for its students is illegitimate. To the extent Wolgast argues that the procedure is illegitimate, he does not explain how an illegitimate decision-making process renders the underlying goal or mission illegitimate. Accordingly, it is reasonable to conclude that Wolgast may undermine the rollout of the one-to-one program, particularly because he would be one of two employees tasked with implementing the program.

**3.**

With respect to "c)" Wolgast makes an argument predicated, once again, on a misunderstanding of his burden at this stage. The burden at the preliminary injunction stage lies

wholly and solely with the plaintiff. *See Overstreet*, 305 F.3d at 573. Simply claiming that Defendants cannot show disharmony among coworkers were Wolgast reinstated is insufficient. It is reasonable to conclude, as Judge Morris did, that disharmony would ensue if an employee with a primary responsibility for implementing a district initiative could speak against the program publicly and then leverage his cooperation for improved employment prospects. Furthermore, Wolgast's statements of displeasure were made directly to the person tasking him with implementing the program. *See Pickering*, 391 U.S. at 570 (expressing concern about comments targeted at immediate superiors that a plaintiff would normally be in contact with during a normal working day). Wolgast has offered no evidence that such a conclusion is unreasonable.

### 4.

Wolgast's next contention, "d)", also confuses the allotment of the burden at this stage of the proceedings. Further, the Report is not constrained to only reaching conclusions offered by one of the parties.

### 5.

As to "e)" Wolgast argues that he is not a confidential employee so he could not destroy the confidence and trust required of confidential employees. For some reason, Wolgast has construed the ideas of confidentiality as relating to labor relations. He offers no explanation for this conclusion. Rather, determining whether Wolgast's comments would destroy the "trust required of confidential employees" attempts to reach the same ultimate inquiry. That is, the Court must determine if Wolgast's "speech . . . interfere[s] with the job [he was] hired to perform or the functioning of the workplace in general." *Leary v. Daeschner*, 349 F.3d 888, 900 (6th Cir. 2003) (citing *Pickering*, 391 U.S. at 568). As explained above, *see supra* III.C.3, Wolgast's comments could reasonably be seen to produce discord and disharmony among those seeking to

implement a new technology measure. Wolgast made no effort to first communicate his displeasure with the program in private but instead spoke out against the initiative at a public meeting of the district's technology committee. A meeting, notably, that Wolgast's direct supervisor, Superintendent Hutchison, was not only present at but actually requested that Wolgast attend.

Although Wolgast is not precluded from raising concerns about the program, his relationship with Superintendent Hutchison is crucial to the effective functioning of district technology initiatives. *See Sharp v. Lindsey*, 285 F.3d 479, 486 (6th Cir. 2002) (noting that the superintendent-principal relationship is "a relationship upon which the effective functioning of the school system depends"). In a district with only two technology employees a superintendent should not be made to fear that important details and criticism about a pilot program will be aired to the public before the program's contours are decided upon. A superintendent also should not have to fear that the same would occur as part of a public negotiation tactic by an employee seeking improved terms of employment. Wolgast's comments could, at this stage, reasonably be said to have undermined parts of his relationship with Superintendent Hutchison that require a modicum of confidentiality.

**6.**

Finally, Wolgast contends with respect to "f)" that he has presented sufficient evidence to show he was on board with the one-to-one program, even citing his letter to Superintendent Hutchison in support. The smattering of evidence Wolgast evokes in support of this sub-objection does little to counter the language he included in his email. The email Wolgast sent to Superintendent Hutchison cannot reasonably be read as attempting to accomplish anything other than more favorable employment conditions in exchange for his cooperation. Wolgast attempts

to construe his claim that he could "ensure a smooth roll-out of the program," Pl.'s Objs. 8, ECF No. 22, as evidence of his cooperation. But read in context, this statement presents as a threat that without Wolgast (retained under improved employment conditions) the program is doomed to fail. Judge Morris' conclusion that Wolgast "would be unable to implement or possibly even would undermine the one-to-one program" finds ample support in the evidence. Rep. & Rec. 17, ECF No. 20. Wolgast's third objection will be overruled.

**D.**

Fourth, Wolgast objects to the Report's determination that he raised an argument for the first time in a reply brief. Judge Morris concluded that Wolgast argued for the first time in his reply that a document listing contract expiration dates listed him under "administration." Rep. & Rec. 10, ECF No. 20. But, according to Wolgast, he raised this argument in his initial motion for a preliminary injunction when he wrote that "[f]or the purpose of his contract and its expiration, Wolgast is classified by the District within the category of 'administration'." Pl.'s Objs. 9, ECF No. 22 (citation to the record omitted). Wolgast is correct. This argument was not first raised in his reply brief. But his objection will still be overruled because it is moot. Although Judge Morris incorrectly found that he first raised this issue in reply, she proceeded to analyze the merits of his claim, resulting in no prejudice to Wolgast's argument.

**E.**

Wolgast's next objection relates to Judge Morris' interpretation of the document listing his contract expiration date under "administration." He argues that the Report "unfairly prejudiced [him] by making an argument on behalf of Defendants which Defendants did not make regarding the contents of the . . . document." Pl.'s Objs. 9, ECF No. 22. Wolgast believes

- 18 -

that he has been prejudiced by Judge Morris "advocat[ing] a specific position on behalf of Defendants regarding what the document's author 'probably' meant." Id. at 10.

Wolgast's objection will be overruled. Judge Morris was not making an argument on behalf of Defendants but rather was addressing Wolgast's claim that the document is proof that he was an administrator. Wolgast, in seeking preliminary injunctive relief, is tasked with demonstrating the likelihood that his case is successful on the merits. In an attempt to meet that burden he has proffered a document listing the expiration dates of certain employment contracts which has his contract expiration date listed under "Administration - varies." There may appear to be little difference to an unsuccessful litigant between a court disagreeing with the party's position and siding with the opposing party, but such is the nature of adversarial dispute resolution. Wolgast sought a certain determination and the Report drew a contrary conclusion. There was no error.

Wolgast goes on in his objection to claim that "the burden of explaining why some people on the list are administrators and others are not should be placed on Defendants[.]" *Id.* But Wolgast misunderstands the assignment of the burdens of presentation at the preliminary injunctions stage. The burden at all times remains with the party seeking the preliminary injunction to demonstrate entitlement to that relief. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) ("It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.") (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948, pp. 129–130 (2d ed. 1995)) (emphasis in original). Even if the document speaks for itself, it does not speak conclusively in favor of a determination that Wolgast will succeed in establishing that he is an administrator.

- 19 -

**F.**

In Wolgast's sixth objection he takes issue with Judge Morris' use of the *eiusdem generis* canon of construction. Pl.'s Objs. 11, ECF No. 22. Wolgast "argues that [the Report] too narrowly restricted the intent of MCL 380.1229's protections." *Id.* (sic to citation). While Wolgast argues both that the Report improperly deploys the canon when reading the statute, his objection is, in essence, that Judge Morris' erroneously concluded that Wolgast was unlikely to succeed in establishing that he is an administrator under the Statute. For that reason, Wolgast's Due Process claim will be reviewed de novo.

The Due Process clause "requires 'some kind of a hearing' prior to the discharge of an employee who has a constitutionally protected property interest in his employment." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Board of Regents v. Roth*, 408 U.S. 564, 569–570 (1972)). The Constitution does not protect all employees from termination but only those with "a property right in continued employment." *Id.* at 538. Property interests, such as that in continued employment, "are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law[.]" *Roth*, 408 U.S. at 577. In *Loudermill*, the Supreme Court concluded "that a state statute providing that civil service employees could be dismissed only for 'misfeasance, malfeasance, or nonfeasance in office' created a property interest in continued employment[.]" *Rodgers v. 36th Dist. Court*, 529 F. App'x 642, 648 (6th Cir. 2013) (quoting *Loudermill*, 470 U.S. at 538–39). In contrast to a statute requiring some showing of cause before an employee may be terminated, "[n]o constitutional entitlement to procedural due process can logically arise when the decision-maker's power is wholly discretionary." *McClain v. NorthWest Cmty. Corr. Ctr. Judicial Corr. Bd.*, 440 F.3d 320, 330 (6th Cir. 2006)

Wolgast alleges that a Michigan statute similarly vests in him a constitutionally protected property interest in continued employment. The statute in question is Michigan Compiled Law 380.1229.[3] Under that statute, certain employees' contracts may only be subject to non-renewal with 60 days' notice. *Id*. at § 1229(2). If notice is not properly and timely given "the contract is renewed for an additional 1-year period." *Id*. Further, the statute requires that a covered employee receive "30 days' advance notice that the board is considering the nonrenewal together with a written statement of the reasons the board is considering the nonrenewal." *Id*. at § 1229(3). After the board issues an advance notice of possible non-renewal but before it issues a statement of non-renewal, the covered employee "shall be given the opportunity to meet with not less than a majority of the board to discuss the reasons stated in the written statement." *Id*.

Neither party disputes these provisions and neither party disputes, at this stage, that Wolgast was not provided with the protections outlined in the statute. The dispute between Wolgast and Defendants focuses on whether Wolgast, as a technology specialist, is entitled to the

---

[3]     The statute reads, in pertinent part:

> (2) The board of a school district or intermediate school district may employ assistant superintendents, principals, assistant principals, guidance directors, and other administrators who do not assume tenure in that position under 1937 (Ex Sess) PA 4, MCL 38.71 to 38.191. The employment shall be by written contract. The term of the employment contract shall be fixed by the board, not to exceed 3 years. The board shall prescribe the duties of a person described in this subsection. If written notice of nonrenewal of the contract of a person described in this subsection is not given at least 60 days before the termination date of the contract, the contract is renewed for an additional 1-year period.

> (3) A notification of nonrenewal of contract of a person described in subsection (2) may be given only for a reason that is not arbitrary or capricious. The board shall not issue a notice of nonrenewal under this section unless the affected person has been provided with not less than 30 days' advance notice that the board is considering the nonrenewal together with a written statement of the reasons the board is considering the nonrenewal. After the issuance of the written statement, but before the nonrenewal statement is issued, the affected person shall be given the opportunity to meet with not less than a majority of the board to discuss the reasons stated in the written statement. The meeting shall be open to the public or a closed session, as the affected person elects under section 8 of the open meetings act, 1976 PA 267, MCL 15.268. If the board fails to provide for a meeting with the board, or if a court finds that the reason for nonrenewal is arbitrary or capricious, the affected person's contract is renewed for an additional 1-year period. This subsection does not apply to the nonrenewal of the contract of a superintendent of schools described in subsection (1).

Mich. Comp. Laws § 380.1229.

statute's protections. Wolgast argues that he is an administrator for the purposes of the statute and thus should have been afforded the protections of the statute and, subsequently, automatically had his contract renewed when he was not. Defendants claim that Wolgast is not an administrator and thus has no constitutionally protected property interest in his employment, which ended when his contract was not renewed at the end of 2014.

Because these arguments arise in the context of a motion for preliminary injunctive relief, a conclusive determination of the merits of the parties' arguments is neither necessary nor warranted. Rather, this Court need only evaluate, as Judge Morris has already done, the likelihood that Wolgast will succeed at the point in the proceeding when the merits of his claim are to be analyzed. Wolgast is unlikely to be successful at that stage of the litigation.

### 1.

The statute in question explicitly applies only to "assistant superintendents, principals, assistant principals, guidance directors, and other administrators[.]" Mich. Comp. Laws Ann. § 380.1229(2). Wolgast contends that his position, identified in his contract as "Technology Support Specialist," Pl.'s Mot., Ex. B, ECF No. 8-3, is an "other administrator" under the Act. He makes three primary contentions in support of this position: (1) first, he argues that he performs duties consistent with those performed by administrators; (2) second, he was classified by the Tawas Area School District as being "administration"; (3) and third, he was also performed duties consistent with a "network administrator." *See* Pl.'s Mot. 9, ECF No. 8.

First, it should be noted that the Statute bears no indication that the residual "other administrators" is meant to encompass network administrators or employees who perform what Wolgast alleges are "administrative functions." Nevertheless, Wolgast argues that there is nothing ambiguous about the term administrator as it applies to him. He is correct. The Statute

unambiguously does not apply to him. Although there is little guidance within M.C.L. 380.1229, other portions of the Michigan School Code of 1976 offer clarity to the provision at issue. For instance, M.C.L. 380.1536 governs the "administrator certificates" which are developed by the state school board and which "shall be issued to all school district and intermediate school district superintendents, school principals, assistant principals, and *other administrators* whose primary responsibility is administering instructional programs and who meet the requirements established under subsection (3)." Mich. Comp. Laws § 380.1536 (emphasis added). There is no precedent for reading the use of "other administrators" in § 380.1536 as different from the "other administrators" denoted in § 380.1229. Under Michigan law "[i]t is axiomatic that if a statute could be interpreted as being consistent or inconsistent with other statutory provisions, the courts are constrained to read the provisions as consistent." *People v. Griffes*, 164 N.W.2d 426, 428 (Mich. Ct. App. 1968). Thus, the requirements imposed on the qualifications of "other administrators" in § 380.1536 helpfully elucidate whether Wolgast is an "other administrator" for purposes of § 380.1229.

As § 380.1536 explains, to qualify as an "other administrator" an individual's "primary responsibility [must be] administering instructional programs[.]" *Id*. Furthermore, that individual must "meet the requirements established under subsection (3)" of M.C.L. § 380.1536. Subsection (3) contains certain conditions for obtaining and retaining an administrator certificate. As Defendants point out and Wolgast does not contest, he possesses no such certificate.

**2.**

Further, perhaps the most troubling evidence against Wolgast is the fact that he conceded in his December 8, 2014 letter to Superintendent Hutchison that he was not an administrator because he sought elevation to that very status.

- 23 -

Wolgast makes an attempt at turnabout by arguing that the Tawas Area School District classified him as being "administration." But this argument is not compelling. The District has, in numerous ways, indicated that it did not consider Wolgast an administrator, most notably in his contract. And, as with Wolgast's argument that he was de facto an "other administrator" a district cannot likewise make someone an "other administrator" under the Statute merely by designating them as such on an internal document.

But this line of reasoning assumes that the District designated Wolgast as an administrator. It did not. Rather, it categorized him in a list of expiring contracts under "Administration - varies." Pl.'s Mot., Ex. D, ECF No. 8-5. The difference between designating an employee as an administrator instead of a part of administration is significant. Wolgast was designated as the latter. Administration is defined as:

> The people within an organization who are responsible for [carrying out or overseeing the tasks necessary to run an organization], considered collectively; the managing body or administrative department of an organization or business.

"Administration, 3.a.&b." Oxford English Dictionary (Third Edition, December 2011). Wolgast does not show, in conjunction with his argument that he was listed under "administration", that being one of the people within an organization who are responsible for carrying out or overseeing tasks necessary to run an organization makes him an administrator. Surely, some of those individuals are administrators, but the groups are not coterminous.

Wolgast's objection will be overruled.

## G.

Seventh, Wolgast argues that the Report misinterprets his argument "regarding the admissibility of statements made by Wolgast at the [December 3, 2014] Technology Committee Meeting." Pl.'s Objs. 13, ECF No. 22. Wolgast seeks to clarify that he objected to the admissibility of Superintendent Hutchison's sworn affidavit recounting Wolgast's statements,

- 24 -

not the admissibility of his own statements. Pl.'s Objs. 13, ECF No. 22. Wolgast's argument is meritless.

Federal Rule of Civil Procedure 56 permits the use of affidavits that are "made on personal knowledge [and] set out facts that would be admissible in evidence." FED. R. CIV. P. 56(c)(4). That rule, however, applies to summary judgment proceedings. The rules governing consideration of evidence in response to a request for a preliminary injunction are even less stringent. *See Cobell v. Norton*, 391 F.3d 251, 260-61 (D.C. Cir. 2004) (noting that there is good reason not to apply Rule 56's evidentiary standards to preliminary injunctions). Thus, to the extent Wolgast objects to Superintendent Hutchison's affidavit addressing Wolgast's statements, those statements would be admissible evidence as an admission by a party opponent, *see* Fed. R. Evid. 801(d)(2), and nothing about the affidavit is itself objectionable. The statements as presented in the affidavit and the affidavit itself are properly considered at this stage.

Yet, Wolgast seemingly claims that because Superintendent Hutchison was required to have minutes kept at the meetings at which Wolgast spoke, but did not, Superintendent Hutchison is now precluded from offering his own recollection of Wolgast's comments. Wolgast offers no support for this evidentiary claim and the Court is unaware of any such that exists. Wolgast's seventh objection will also be overruled.

## H.

Eighth, Wolgast objects that if he is successful on his Due Process claim then he can also succeed in his Whistleblower Protection Act claim. Pl.'s Objs. 13, ECF No. 22. Wolgast is correct, in principle, but the inverse is equally correct, in principle. Since he is unlikely to succeed on his Due Process claim he is incorrect that the Report's analysis should be rejected. Where an employee does not have any expectation of continued employment, nonrenewal of a

contract is not actionable under the WPA. *Wurtz v. Beecher Metro Dist.*, 848 N.W.2d 121, 125 (Mich. 2014). Wolgast's objection will be overruled.

## I.

For Wolgast's ninth objection he takes issue with the Report's conclusion that Wolgast's demonstration of irreparable harm is only speculative. Pl.'s Objs. 14-15, ECF No. 22. Wolgast rests his argument on a case from the Sixth Circuit that holds where a party demonstrates likelihood of success on a First Amendment claim irreparable harm is established. *See Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998).[4] But here, since Wolgast does not demonstrate likelihood of success on the merits of his First Amendment claim, his irreparable harm objection need not be entertained. He does not, as a result, benefit from the rule in *Connection Distribution Company v. Reno*. This objection will be overruled.

## J.

Tenth, Wolgast argues that the Report "erroneously found that reinstating Wolgast 'could result in substantial harm to Defendants, students, teachers, and the community.'" Pl.'s Objs. 15, ECF No. 22 (quoting Rep. & Rec. 21, ECF No. 20). But as above, see § III.I, Wolgast argues that establishing a likelihood of success on his First Amendment claim is "sufficient for meeting the harm-to-the-public prong of a preliminary injunction inquiry." Pl.'s Objs. 16, ECF No. 22. Because Wolgast does not demonstrate a likelihood of success on his First Amendment claim, this objection will be overruled.

---

[4]    Wolgast potentially makes two separate arguments: first, that if a person of ordinary firmness would be deterred from continuing to engage in the conduct at issue irreparable harm is established; and second, that likelihood of succeeding on a First Amendment claim establishes irreparable harm. The two arguments are the same. The former argument simply sets forth why, when First Amendment rights are at stake, courts have concluded that irreparable harm is present where plaintiffs demonstrate a likelihood of success on the merits.

**K.**

Wolgast's final objection is that the Report erroneously suggested that preliminary injunctive relief is inappropriate because it would upset the status quo. Pl.'s Objs. 16-17, ECF No. 22. At the opening of the analysis, Judge Morris' Report states: "I suggest that reinstatement of employment is not an appropriate remedy at this stage because preliminary injunctions are designed to preserve the status quo until the case is decided. But here, the status quo is that Plaintiff is not currently employed by the Board." Rep. & Rec. 7, ECF No. 20 (citing *United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004)).

But the requirements for granting preliminary injunctive relief are not so formal. While courts rarely grant preliminary injunctive relief in the form of reinstatement, such relief has been given. *See, e.g.*, *Cron v. Chandler*, 25 F.3d 1047 (6th Cir. 1994) (affirming reinstatement of two employees as form of preliminary injunctive relief) and *Truck Drivers, Oil Drivers, Filling Station & Platform Workers, Local 705, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Almarc Mfg., Inc.*, 553 F. Supp. 1170 (N.D. Ill. 1982) (reinstating plaintiff truck drivers pending determination on the merits). The Report errs by suggesting reinstatement is an inappropriate remedy for preliminary injunctive relief. That portion of the report will be rejected.

**IV.**

Accordingly, it is **ORDERED** that Plaintiff Wolgast's Objections are **SUSTAINED in part** and **OVERRULED in part**.

It is further **ORDERED** that the Report & Recommendation, ECF No. 20, is **ADOPTED in part** and **REJECTED in part**.

It is further **ORDERED** that Plaintiff Wolgast's Motion for Preliminary Injunction, ECF No. 8, is **DENIED**.


Dated: September 22, 2015                          s/Thomas L. Ludington
                                                   THOMAS L. LUDINGTON
                                                   United States District Judge

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 22, 2015.

s/Michael A. Sian
MICHAEL A. SIAN, Case Manager