## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

BRANDON M. WOLGAST,

                      CASE NO. 15-cv-10495

     *Plaintiff*,

                      DISTRICT JUDGE THOMAS L. LUDINGTON
*v.*                    MAGISTRATE JUDGE PATRICIA T. MORRIS

TAWAS AREA SCHOOL DISTRICT
BOARD OF EDUCATION,
JEFFREY HUTCHINSON,
ANNE FREEL, and
CONNIE O'CONNOR,

     *Defendants*.
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. 56) PLAINTIFF's AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. 63) AND PLAINTIFF'S MOTION FOR LEAVE TO FILE NEWLY DISCOVERED EVIDENCE (Doc. 73)

## I.   RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that:

**1)**    Defendants' motion for summary judgment (Doc. 56) be **GRANTED** as to Counts I and II with prejudice, and that the state law claims in Counts III, IV, V, VI, VII and Count VIII be dismissed without prejudice. Alternatively, if the court does not dismiss the state law claims, I suggest that Defendants' motion be granted as to Counts III, IV, V, and Count VIII as to allegations regarding the Personnel Committee, and denied as to Counts VI, VII, and Count VIII as to allegations regarding the Standing Technology Committee.

**2)**    Plaintiff's motion for Partial Summary Judgment (Doc. 63) should be **DENIED.**

**3)**    Plaintiff's motion to file newly discovered evidence (Doc. 73) should also be **DENIED.**

## II.   <u>REPORT</u>

### A.   **Background**

Proceeding *pro se*, Plaintiff Brandon Wolgast filed this action on February 6, 2015. (Doc. 1.) On February 10, 2015, United States District Judge Thomas L. Ludington referred all pretrial matters to the undersigned magistrate judge. (Doc. 3.) Plaintiff filed an Amended Complaint on February 23, 2015. (Doc. 7.) Discovery ended on July 31, 2015 pursuant to the Scheduling Order. (Doc. 19.) Presently before the court is Plaintiff's September 25, 2015 amended motion for partial summary judgment (Doc. 63), and Defendants' September 16, 2015 cross motion for summary judgment. (Doc. 56.) Plaintiff filed a response to Defendants' motion on October 8, 2015. (Doc. 66.) Defendants filed a response to Plaintiff's motion on October 16, 2015. (Doc. 68.) Both parties also filed replies. (Def. Reply Doc. 70; Pl. Reply Doc. 72.) Also before this court is Plaintiff's motion and accompanying brief for leave to file newly discovered evidence which was filed on December 3, 2015. (Doc. 73.) Defendants submitted a response on December 11, 2015. (Doc. 74.) Therefore, Plaintiff's and Defendants' motions are ready for report and recommendation without oral argument. *See* E.D. Mich. L.R. 7.1(f)(2).

Plaintiff was employed as a Technology Support Specialist by the Tawas Area School District ("District"). (Am. Compl. Doc. 7 ¶ 2; Answer, Doc. 11 ¶ 2.) Defendants are the Tawas Area School District Board of Education ("Board"); Jeffery Hutchison, Superintendent; Anne Freel, former Board President; and Connie O'Connor, former Board Vice President. (*Id.* at ¶1.) On December 11, 2014, Superintendent Hutchison notified Plaintiff that the Board would not

be renewing his employment contract and Plaintiff was placed on paid administrative leave until his present contract terminated on December 31, 2014. (*Id.* ¶ 82.)

Plaintiff's claims against Defendants include (1) a 42 U.S.C. § 1983 ("section 1983") claim for their failure to provide Plaintiff a hearing before the non-renewal of his employment contract in violation of his Fourteenth Amendment right to procedural due process; (2) a section 1983 claim for First Amendment retaliation by not renewing Plaintiff's employment contract because he engaged in protected speech; (3) retaliation under Michigan's Whistle-Blower's Protection Act ("WPA"), Mich. Comp. Laws §§ 15.361-15.369; (4) a violation of Michigan Compiled Laws § 380.1229 for failure to give notice of and provide a hearing for the non-renewal of an employment contract; (5) termination without a proper board vote in violation of Michigan Compiled Laws § 380.1201; (6) creation of a public policy without a proper board vote in violation of Michigan Compiled Laws § 380.1201; (7) engaging in secret deliberations in violation of Michigan's Open Meetings Act ("OMA"), Mich. Comp. Laws §§ 15.261-15.275; and (8) failure to take and keep minutes at an open meeting in violation of Michigan's Open Meetings Act, *Id.* (Am. Compl., Doc. 7 ¶¶ 97-121.)

Defendants seek summary judgement on all eight counts. (Doc. 56.) Plaintiff seeks summary judgment on four claims: (1) the section 1983 Fourteenth Amendment violation; (2) the improper non-renewal of his contract under MCL § 380.1229; (3) the creation of a public policy without a proper board vote in violation of Michigan Compiled Laws § 380.1201; and (4) the failure to take  and keep minutes at an open meeting in violation of Michigan's Open Meetings Act. (Doc. 63.)

In March 2011, Plaintiff was hired as an hourly Technology Technician by Tawas Area Schools. (Doc. 56, at 3; Doc. 63, at 1.) Plaintiff initially reported to the Technology Director, and after that position was eliminated, to the Technology Network Coordinator. (Doc. 56, at 3; Doc. 63, at 1.) In October 2013, Plaintiff submitted his resignation to the Board due to conflicts with the Technology Network Coordinator, but his resignation was not accepted. (Doc. 56, at 3 (citing Pl. Dep. Ex. A ¶ 111).) The Technology Network Coordinator was terminated, and the District subsequently eliminated the position.[1] (Doc. 56, at 4 & n.4; Doc. 63, at 1.)

Plaintiff entered a specific term contract for January 1, 2014 through December 31, 2014 as a Technology Support Specialist, which was a newly-created position outside the American Federation of State, County and Municipal Employees ("AFSCME") union contract. (Doc. 56, at 4 (citing Ex. M); Doc. 63, at 1-2.) No job description existed for this position. (*Id.*) Plaintiff's written employment contract did not contain a written guarantee of renewal. (Doc. 56, at 4 & Ex. M.) Plaintiff began reporting directly to High School Principal Eric Diroff. (Doc. 56 at 4, n.4; Doc. 63, at 2.) In August 2014, Ben Kendra was hired as a Technology Support Specialist; he signed an employment contract virtually identical to Plaintiff's contract. (Doc. 56, Exs. M; S.)

---

[1] Plaintiff alleges that President Freel was responsible for terminating the Technology Network Coordinator, and that contrary to her testimony, Wolgast's complaints played a role in his termination. (Doc. 66, at 17-18.) Citing a Facebook conversation between Wolgast and Freel, in which Freel informed Wolgast that the information he provided had an impact, he argues that any statements by Freel regarding Wolgast's termination cannot be believed. (*Id.* at 18.) The court notes that credibility assessments are the role of the jury, and at the summary judgment stage, the Court must draw "all justifiable inferences" in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Thus, at this stage, the court accepts that Wolgast's complaints played some role in the termination of the Technology Network Coordinator.

In 2013 an informal technology committee, including Plaintiff, was formed. (Doc. 56, at 4-5; Doc. 63, at 19-20.) The Committee's goals included exploring and possibly implementing a one-to-one initiative, that is, a program with the end goal of one computer device for every student. (Doc. 56, at 1, 5; Doc. 63, at 20.) As a committee member, Plaintiff visited Traverse City to learn how that school district implemented a laptop take-home project and he presented a proposal on the technical aspects of a one-to-one program. (Doc. 56, at 5 (citing Ex. A, at 169-73).)

On November 4, 2014, Tawas School District voters passed a $9.72 million bond; $500,000 was assigned to technology improvements. (Doc. 56, at 1.) The Bond proposal requested funds to "[e]nhance instruction and assessment (K-12) by increasing access to technology (one device per student)." (*Id.*; Doc 56. Ex. O, at Pg. ID 1479.) On November 6, 2014, Defendant Freel emailed Defendants Hutchison and O'Connor, as well as Board member James Bacarella, that "[i]f we're going to implement one to one we need to use the technology completely and not support our old ways . . . which is what some of our staff would like to do." (Doc. 63, Ex. X, at 2369-70.) On November 10, 2014, the Board scheduled a meeting for November 19 of the Standing Technology Committee, comprised of Board Members Freel, O'Connor, and Bacarella. (Doc. 56, at 5 & Ex. BB, at Pg. ID 1545.) On November 11, 2014, Superintendent Hutchison emailed Plaintiff, Technology Support Specialist Kendra, and District principals—Peter Newman, Stacey Mochty, and Eric Diroff—the following:

> We need to start meeting as a tech committee again. Our first meeting this year will be November 19th at 5:30 in [the] central office. It will only be us and 3 [Board] members in attendance[;] no teachers for this one.

(Def. Ex. GG; Doc. 56, at 5-6.)

The November 19 meeting was publicly posted; however, minutes were not taken. (Doc. 63, at 22 (citing Ex. X at Pg. ID 2376).) Committee members O'Connor and Bacarella attended, as well as Superintendent Hutchison and the District employees, including Plaintiff, who received the above email.[2] (Doc. 7 ¶ 26; Doc. 11 ¶ 26.) The Committee "discussed numerous aspects of the one-to-one initiative, including whether to provide devices for students to take home, what devices to provide, the costs of various programs, and when the program could be implemented." (Doc. 63, at 22 (citing Def. Resp. Doc. 15, Hutchison Aff. Ex. A ¶ 22).) During the meeting Wolgast asked how decisions regarding the one-to-one program would be made and how different opinions would be resolved. (Doc. 63, at 22.) He was informed by Vice President O'Connor that the Standing Technology Committee would submit recommendations to the Board and the Board would make the final decision. (*Id.* (citing Ex. Z, 8-9).) Wolgast supported a hybrid one-to-one program which would provide students with take-home e-readers. (Doc. 7 ¶ 28.) He also expressed concerns about the cost and sustainability of a take-home program involving laptops. (Doc. 66, at 25.) He also "informed the Committee that he had spoken to all teachers grades 9-12 and that the overwhelming majority [were] opposed to the devices being taken home by students."[3] (Doc. 7 ¶ 32.) Wolgast suggested that teachers should have input on the proposal submitted to the board and proposed a meeting of the informal technology committee, which was then scheduled for December 10. (*Id.*; Doc. 63, at 22.)

---

[2] Defendant Freel was not in attendance. (Doc. 63, at 22.)
[3] Plaintiff testified that the source of this information was informal questioning of "[t]he majority of teachers in grades 9 through 12." (Doc. 56, Ex. A, at 187-97.)

Defendants state that Superintendent Hutchison decided, prior to the November 19 meeting, that a take-home program would be initiated in fall 2015 and that he was simply seeking input on issues such as the type of device to provide. (Doc. 56, at 6 (citing Hutchison Aff. Ex. K ¶ 3).) "Instead, he was confronted with resistance and negativity from Plaintiff, the very person he needed to rely on to reach the District's goals." (*Id.*)

After the meeting, Defendants Freel, O'Connor, Hutchison, and Board Member Bacarella engaged in a series of emails discussing whether the November 19 meeting was a "waste of time," how to move forward with the one-to-one program, the possibility of teacher and student surveys, and the proposed vote before the informal technology committee. (Doc. 63, Ex. X, at 2380-90.) Freel testified that when she spoke to Hutchison that morning:

> He knew what the Board of Education had asked of him; to implement a 1:1 program. He knew how he wanted to implement it. He allowed [Wolgast] or [Wolgast] and Ms. Mochty to argue with him the night before about what he wanted and what the Board of Education wanted, and that was going nowhere fast and he recognized that. He knew that he needed to take control and implement 1 to 1 the way the Board wanted it implemented.

(Doc. 63, Ex. X, at 19-20.)

Bacarella emailed Freel explaining that "there is resistance from the staff to a one to one" specifically taking home laptops. (*Id.* at Pg. ID 2380.) He also informed her that Wolgast "was pushing it to a vote in front of the [informal technology] committee. I think that would be a huge mistake." (*Id.*) Bacarella also emailed Superintendent Hutchison that he was "disappointed by a lack of vision" after the meeting. (*Id.* at Pg. ID 2382.) He wrote, "I think I was missing the point by focusing on do we take the device home or not. I think we need to start with what do we want this technology and teaching environment to look like when we are done and then work back from there." (*Id.*)

7

The Superintendent responded at 8:25 a.m. as follows:

> I also left very frustrated from the meeting. I apologize for wasting your evening. I plan to meet Eric [Diroff] and Stacey [Mochty] and talk about how we get where [we] need to go. I think it will look a lot like I talked about last night 9-12 take home device[s] with 5-8 to follow in time. . . . On a larger scale[,] I think the end product/vision needs to be defined primarily by the teacher and administration at this point[,] and then we come back to the [Board] committee and tech department to present. With the committee endorsement we would then present to the entire [Board] for permission to purchase the needed infrastructure and devices from the bond money.

(*Id.*)

At 9:27 a.m., Board member Bacarella emailed Superintendent Hutchison that "[i]t has to be clear with the staff that this is an important educational tool[] that they need to embrace as a part of their job." (*Id.* at 2383.) Hutchison agreed, writing that the tech leaders will be on board if they address concerns and show "the limitations of not taking the device home. . . . Then we take steps to bring the rest along with expectation, vision, and training prior to implementation." (*Id.*). Superintendent Hutchison then forwarded the emails with Bacarella to President Freel and Vice President O'Connor. (*Id.*) At 10:45 a.m., Defendant Freel emailed Hutchison that she thought the "end goal[,] in relatively short order[,] needs to be a completely digital school and that [it] needs to be made clear to administration and staff now as opposed to later. . . ." (Doc. 63, Ex. X, at Pg. ID 2383-84.) At 2:54 p.m., Superintendent Hutchison responded:

> I agree and I'll do my best to make it happen. I met with Eric [Diroff] and Stacey [Mochty] today[, and] I think they understand the direction we are going and that many decisions have been made. I am meeting with department heads on Tuesday, Dec. 2nd to begin to clarify this vision. I plan to tell them why we are moving to a one to one. I will tell them that our one to one will include E textbooks, paperless or near paperless classrooms based on electronic submission and return of assignments and assessments, many online resources, a data system that uploads grades to grade books, students notes on their devises. [sic] To do this the students

will have to have devises [sic] with internal hard drives that they can take home. . . . I see these as minimum[] expectations.

(Doc. 63, Ex. X, at Pg. ID 2384.) Via e-mail the Standing Technology members and Hutchison agreed to a timeline for implementation of the laptop take-home project. (Doc. 66, at 26 (citing Ex. X, at 32-38).)

On December 3, 2014, the Standing Technology Committee met again. (Doc. 56, at 8; Doc. 63, at 26.) The meeting was publicly posted and minutes were not taken. (Doc. 63, at 27 (citing Ex. X, at Pg. ID 2403).) Plaintiff received an email from Hutchison, stating that it is "very important" that Wolgast and Technology Support Specialist Kendra attend. (Doc. 56, at 8 (citing Ex. MM).) Defendant Hutchison testified that the purpose of the meeting was to "make sure that you were clear as to the fact that this is the goal and this is where we're going and what the expectations were going to be." [4] (Doc. 56, at 8 (citing Hutchison Dep. Ex. B, at 54).) At the meeting, the committee informed Wolgast that they would be moving forward with a take-home laptop program for grades 9-12 in fall 2015. (Doc. 56, at 8-9; Doc. 66, at 14.) Wolgast was then questioned by Freel regarding his ability to implement the program by fall 2015. (Doc. 56, at 9; Doc. 66, at 14.) Wolgast informed Freel that he needed more information. (Doc. 66, at 14 (citing Ex. 1, Wolgast Decl. ¶ 10).) Wolgast raised a number of issues, including the fact that he did not have a written job description and that closing down the computer labs would "gut the CAD, Graphic Arts and Business programs due to the licensing and hardware requirements. . . ." (Doc. 66, at 15.) He also expressed "concerns over his personal workload." (Doc. 56, at 9 (citing Doc. 18, Pl. Aff. Ex. B ¶ 10, at Pg. ID 302).)

---

[4] It appears from the context of the deposition that Hutchison was referring to Wolgast, although I note that both Wolgast and Kendra were requested to attend the meeting. (Doc. 56, Exs. MM; B, at 53-54.)

Wolgast learned that the informal technology committee had been "dissolved," and that the December 10 meeting was cancelled. (Doc. 66, at 15.)

The Board members exchanged emails after the meeting, expressing concerns that Wolgast does not "understand his role." (Doc. 66, at 14 (citing Ex. E, at Pg. ID. 2508).) Freel admitted to being aggressive at the meeting and "possibly provok[ing]" Wolgast. (*Id.*) Bacarella expressed concerns that Wolgast was disrespectful, would be a "roadblock" to implementation of the project, and may "sabotage the project, even if it is subconsciously." (*Id.*) The Board members also speculated that Wolgast may resign, and Freel wrote, "If [Wolgast] does not quit, it may be a good idea to force the 40 [hour] a week work issue (that's been ongoing). He has a second job and has told us if he works for us 40 [hours] a week he'll lose money." (*Id.* 2508.) Hutchison informed Freel that Wolgast had "an attitude adjustment overnight." (*Id.* at Pg. ID 2510.)

On December 8, 2014, an internal staff meeting was held to inform staff about the take-home project. (Doc. 66, at 9; Doc. 7 ¶¶61-62.) Superintendent Hutchison states that Plaintiff "was the most negative person in the room." (Doc. 56, at 9.) Wolgast alleges that like other staff members he "provided specific information regarding the 4:1 cost difference between take-home laptops and classroom-managed laptops. Wolgast also expressed concerns about the practicality of a roll-out less than 8 months away." (Doc. 7 ¶ 64.) He also "suggested that the decisions stated by Hutchison as being final were not truly final until the Board approved them." (*Id.* ¶ 65.) Plaintiff attended, but did not speak at the December 8 board meeting. (Doc. 56, at 10.)

On December 8, 2014 Plaintiff emailed Hutchison a letter as an attachment. (Doc. 56, Ex. N.) On December 9, Superintendent Hutchison contacted the school attorney and Freel to discuss not renewing Plaintiff's contract. (Doc. 66, at 6 (citing Doc. 44, Hutchison Aff. Ex. E ¶¶ 5-7).)

On December 10, 2014 Hutchison read the December 8 letter for the first time. In the letter Wolgast acknowledged that his "contract is up in about 3 weeks" and detailed a number of issues he had with his employment. (Doc. 56, Ex. N.) He made a series of contractual demands and concessions related to his current and future employment: (1) an increase in job title to administrator; (2) an increase in salary; (3) merit pay; (4) a limitation on yearly days worked; (5) reasonable assurance of summer help; (6) reasonable assurance he can participate in selecting technology office locations; and (7) discretion to determine which computer labs should close. (*Id.*) Wolgast then addressed the one-to-one program, admitting that he is "somewhere between being highly skeptical and outright against," certain aspects of the program. (*Id.*) He stated:

> Bottom line is this – if the district wants a successful one-to-one program, I'm willing to drop my objections to the take-home laptops and readjust my attitude to a more positive one, but the board must be willing to compromise with me, because I feel that I'm conceding a LOT here by accepting the responsibility of trying to manage such a program.

(*Id.*)

Superintendent Hutchison shared the email with the Board's Standing Personnel Committee on December 10. (Doc. 56, at 11.) He informed the members that he was not recommending Plaintiff's contract for renewal, and the committee did not oppose his decision. (*Id.*) On December 11, 2014, Hutchison advised Plaintiff that his contract would not be

11

submitted for renewal. (*Id.*) He placed Plaintiff on administrative leave until December 31, 2014 and removed his access to District technology. (*Id.*) On December 15, 2014, the Personnel committee made recommendations on contract renewals to the Board; Plaintiff's contract was not discussed. (*Id.* (citing Ex. DD).)

**B.     Motion Standards**

A motion for summary judgment will be granted under Rule 56 of the Federal Rules of Civil Procedure when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). All facts and inferences must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party has "'the initial burden of showing the absence of a genuine issue of material fact' as to an essential element of the non-movant's case." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting *Celotex Corp. v Catrett*, 477 U.S. 317, 323 (1986)). In determining whether the moving party has met its considerable burden, a court may consider the plausibility of the moving party's evidence. *Matsushita*, 475 U.S. at 587-88. Summary judgment is also proper where the moving party shows that the non-moving party is unable to meet its burden of proof. *Celotex*, 477 U.S. at 325.

The non-moving party cannot rest merely on the pleadings in response to a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Instead, the non-moving party has an obligation to present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). When the non-moving party fails to

adequately respond to a summary judgment motion, a district court is not required to search the record to determine whether genuine issues of material fact exist. *Street*, 886 F.2d at 1479-80. Instead, the court will rely on the "facts presented and designated by the moving party." *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 404 (6th Cir. 1992).

After examining the evidence designated by the parties, the court then determines "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251-52). Summary judgment will not be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

### C. Analysis

#### 1. Federal Claims

##### a. *Procedural Due Process Claim — Count I*

Both Plaintiff and Defendant seek summary judgement on Plaintiff's claim that the District deprived him of a property interest without due process by deciding not to renew his contract, without providing notice or an opportunity to be heard. (Doc. 56, at 19; Doc. 63, at 8.)

To prevail on a procedural due process claim, a plaintiff must show the state deprived him or her of a property or liberty interest without due process. *Town of Castle Rock. v. Gonzales*, 545 U.S. 748, 756-57 (2005); *Wojcik v. City of Romulus*, 257 F.3d 600, 609 (6th Cir. 2001). Specifically, a plaintiff must show three elements: (1) "[t]hat they have a life, liberty or property interest protected by the Due Process Clause;" (2) "that they were deprived of this protected interest within the meaning of the Due Process Clause;" and (3) "that the state did

13

not afford them adequate procedural rights prior to depriving them of their protected interest." *Hahn v. Star Bank*, 190 F.3d 708, 716 (6th Cir. 1999).

In *Board of Regents v. Roth*, the Supreme Court found that property interests are defined not by the Constitution, but "by existing rules or understandings that stem from an independent source such as a state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." 408 U.S. 564, 576 (1972). Further, "[n]o constitutional entitlement to procedural due process can logically arise when the decision-maker's power is wholly discretionary." *McClain v. Northwest Cmty. Corr. Ctr. Judicial Corr. Bd.*, 440 F.3d 320, 330 (6th Cir. 2006).

Plaintiff contends that the Revised School Code ("Code"), which addresses the non-renewal of an administrator's contract created a property interest in his continued employment. (Doc. 63, at 8.) The Code provides in relevant part:

> (2) The board of a school district . . . may employ assistant superintendents, principals, assistance principals, guidance directors, and other administrators who do not assume tenure in that position. . . . The employment shall be by written contract. . . . The board shall prescribe the duties of a person described in this subsection. If written notice of nonrenewal of the contract of a person described in this subsection is not given at least 60 days before the termination date of the contract, the contract is renewed for an additional 1-year period.

> (3) A notification of nonrenewal of contract of a person described in subsection (2) may be given only for a reason that is not arbitrary or capricious. The board shall not issue a notice of nonrenewal under this section unless the affected person has been provided with not less than 30 days' advance notice that the board is considering the nonrenewal together with a written statement of the reasons the board is considering the nonrenewal. After the issuance of the written statement, but before the nonrenewal statement is issued, the affected person shall be given the opportunity to meet with not less than a majority of the board to discuss the reasons stated in the written statement. . . . If the board fails to provide for a meeting with the board, or if a court finds that the reason for nonrenewal is arbitrary or capricious, the affected person's contract is renewed for an additional 1-year period.

14

M.C.L. § 380.1229(2)-(3).

Neither party disputes that Wolgast was not provided the protections outlined in the statute. (Doc. 56; Doc. 63.) Thus, the only issue in dispute is whether Wolgast was entitled to the statue's protections as a Technology Support Specialist. As this Court previously noted "the requirements imposed on the qualifications of 'other administrators' in § 380.1536 helpfully elucidate whether Wolgast is an other administrator for purposes of § 380.1229." (Doc. 61, at 23). M.C.L. § 380.1536 requires the state board to develop and issue an administrator certificate "to all school district and intermediate school district superintendents, school principals, assistant principals, and other administrators whose primary responsibility is administering instructional programs and who meet the requirements established under subsection (3)." M.C.L. § 380.1536(1). Subsection (3) sets forth certain standards which the board must develop describing the conditions necessary for obtaining and retaining an administrator certificate. "There is no precedent for reading the use of other administrators in § 380.1536 as different from the 'other administrators' denoted in § 380.1229." (Doc. 61, at 23.) Thus to qualify as an "other administrator" under M.C.L. 380.1229 an employee's "primary responsibility [must be] administering instructional programs" and they must have obtained a certificate from the state board. *Id.* Here, Defendants assert, and Plaintiff does not deny, that Plaintiff does not have the requisite certificate. (Doc. 56, at 22 n.15.) Furthermore, Plaintiff's self-described official duties do not include "administering instructional programs." (Doc. 63, at 2-6 (listing a number of responsibilities such as evaluating the District's overall technology needs; ensuring state technology standards are met; managing an annual licensing budget; managing the District's technology inventory; and deciding whether District technology meets

15

the needs of the curriculum).) Thus, Wolgast is not an administrator under M.C.L. § 380.1229(2).

Wolgast attempts to avoid this interpretation of the statute by arguing that § 380.1229 "must be interpreted as specifically applying to any employee who provides administrative or personnel services, is non-tenured, and is employed by a written, fixed-term contract not exceeding 3 years." (Doc. 63, at 16). To support this assertion, Plaintiff argues that because of the frequent use of the term "administrator" throughout the Code and the lack of a definition, the legislature intended for the common definition of the word to apply. (*Id.* at 9.) He then asserts that an administrator is defined as "a person whose job is to manage a company, school, or other organization," and since he "was substantially involved in the management of the school's operations" he was an administrator. (*Id.* (citing MERRIAM-WEBSTER, http://merriam-webster.com/dictionary/administrator (last visited Dec. 6, 2015)).)

However, this interpretation is flawed for a number of reasons. First, it is inconsistent with the requirement that an administrator be certified under M.C.L. § 380.1536. As this Court previously noted, "[u]nder Michigan law '[i]t is axiomatic that if a statute could be interpreted as being consistent or inconsistent with other statutory provisions, the courts are constrained to read the provisions as consistent." (Doc. 61, at 23 (citing *People v. Griffes*, 164 N.W. 2d 426, 428 (Mich. Ct. App. 1968).) Second, there is a significant difference between an administrator and one who performs administrative duties. (Doc. 61, at 24.) Wolgast's definition is overbroad and would apply the protections under M.C.L. § 380.1229 to almost every non-teaching employee in the District.

16

Wolgast also argues that since § 308.1229 applies to guidance directors, who are not subject to the provisions of M.C.L. § 380.1536, the statute cannot be read to limit "other administrators" to only those who have received an administrative certificate. (Doc. 63, at 15-16.) He argues that guidance directors are school counselors and are subject to separate requirements under M.C.L. § 380.1233. (*Id.* at 15.) However, Wolgast's argument supports the Court's reading of the statute. If guidance directors are indeed subject to further qualifications defined elsewhere in the statute, then it would be consistent for the legislature to set forth requirements that "other administrators" must satisfy elsewhere in the statute as well.

Next, Wolgast argues that he is a supervisor and thus an administrator because he was removed from the AFSCME Union when he was promoted to a technology support sepcialist. (Doc. 66, at 21-22.) However, the Court will not address this argument because, as Defendants point out, even if Plaintiff was a supervisor, he has provided no evidence that a supervisor is in fact an administrator. (Doc. 70, at 9-10.)

Plaintiff argues, in the alternative, that he was entitled to due process protection virtually identical to that provided under M.C.L. § 380.1229 under District Policy 1443. (Doc. 63 at 19 (citing Ex. P, at Pg. ID 2301).) He addresses this argument in a single sentence, stating that the District policy is less restrictive and creates a property interest in all administrator contracts. (*Id.*) He does not provide support or demonstrate that he is an administrator for purposes of District Policy 1443. I suggest that this argument is waived because it is perfunctory and fatally undeveloped. *See Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013) ("[A]rguments adverted to in only a perfunctory manner, are waived.)

I therefore suggest that Defendants be granted summary judgment as to Count I of Plaintiff's amended complaint.

### b.    First Amendment Retaliation Claim — Count II

Plaintiff claims that his contract was not renewed and he was placed on administrative leave in retaliation for statements he made at the November 19 and December 3 Board meetings in violation of his First Amendment rights. (Doc. 7 ¶ 101.) Defendants seek summary judgment on this claim.

To prevail on a First Amendment retaliation claim, a plaintiff must show: (1) the plaintiff engaged in constitutionally-protected conduct; (2) the defendant's adverse action would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) a causal connection exists between elements one and two, that is the adverse action was motivated at least in part by the plaintiff's protected conduct. *Thaddeus-X v. Blatter*, 175 F.3d 378, 395 (6th Cir. 1999) (en banc); *Kennedy v. City of Villa Hills*, 635 F.3d 210, 217 (6th Cir. 2011).

A public employee plaintiff who claims retaliatory discharge by a government employer must "meet additional standards to establish that the speech at issue is constitutionally protected." *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The first requirement is that the employee "spoke as a citizen on a matter of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968) (teacher's exercise of right to speak on issues of public importance, an accusation that too much money was being spent on athletics, could not serve as basis for dismissal from public employment)). There is no cause of action, and the analysis thus ends, "when public employees make statements pursuant

18

to their official duties [because] the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421.

If, however, the matter is of public concern and the employee is speaking as a citizen, then the second line of inquiry requires the plaintiff to "show that [his or] her interest in addressing these matters of public concern outweighs the interest of [his or] her employer 'in promoting the efficiency of the public services it performs through its employees.'" *Id.* (quoting *Pickering*, 391 U.S. at 568).

The *Pickering* framework then shifts the burden to the defendant. *Leary*, 349 F.3d at 898 ("Once the public-employee plaintiff has met [his or] her burden and established a *prima facie* case, the burden of persuasion shifts to the defendant."). The defendant must show by a preponderance of the evidence "that there were other reasons for the adverse action and that the same adverse action would have resulted even if the plaintiff had not engaged in the protected activity at issue." *Id.* This is a question of fact and "may not be decided on a motion for summary judgment unless the evidence is so one-sided that one party must prevail as a matter of law." *Id.* (internal quotations omitted).

Defendants first seek summary judgement on the grounds that Plaintiff was speaking as an employee. Defendants claim Plaintiff spoke as an employee because the superintendent told him to attend the meetings and conduct research, which he reported on at the meetings. (Doc. 56, at 14-15.) In response, Plaintiff argues that he spoke as a private citizen because "he was speaking after school hours, off the clock, without pay, at two separate open meetings which had been publicly posted, to a committee [of] which [he] was not a member." (Doc 66, at 24.)

19

Even assuming that Plaintiff was present at the meeting as part of his employment, the mere fact that an employee spoke in the workplace is not dispositive. *Garcetti*, 547 U.S. at 420.

In support of their argument, Defendants next point out that Plaintiff could not have believed he was expressing his opinion as a private citizen because he testified that he believed he was speaking at an informal technology committee meeting of which he was a member. (*Id.* at 15 n.10 (citing Ex. A, at 217-18).) They also state that the objections he raised at the meetings arose from his personal opinions and issues which were "developed by Plaintiff in his role as a [technology support specialist]." (*Id.* at 15-16.)

Plaintiff argues that he spoke as a private citizen because several issues of public concern that he raised were unrelated to his duties as a technology support specialist, including the sustainability of the program, the teaching staffs' opposition to the take-home program, and the decision making process. (Doc. 66, at 25-26.) Wolgast admits that he obtained knowledge of these issues by working for the District but asserts that this weighs in his favor. ( *Id.*) He compares his situation to that in *Pickering* where "[t]eachers . . . as a class, [were] the members of a community most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal." (*Id.* (quoting *Pickering*, 391 U.S. at 572 (1968).) He then points out that the Supreme Court applied this principle to all public sector employees in *Lane v. Franks*, 134 S. Ct. 2369 (2014), stating that "our precedents dating back to Pickering have recognized that speech by public employees on subject matter related to their employment holds special value precisely because those

employees gain knowledge of matters of public concern through their employment." 134 S. Ct. at 2379.

Defendants allege that Plaintiff's reading of *Pickering* is mistaken and overbroad, "because, if public employees' speech regarding their employer is automatically protected based solely on the knowledge they have, no employer could ever lawfully discipline an employee for speech." (Doc. 70, at 4.) Defendants interpret *Lane* as holding that "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." (Doc. 70, at 2 (citing *Lane*, 134 S. Ct. at 2377).) They then cite to a number of cases asserting that "in case after case, courts have held that teachers and school employees spoke as employees when complaining about curriculum choices (*Evans-Marshall v. Bd. Of Educ.*, 624 F.3d 332 (6th Cir. 2010)); workload (*Fox v. Traverse City Area Pub. Schs. Bd. of Educ.*, 605 F.3d 345 (2010)); and school security and discipline of students (*Pacheo v. Waldrop*, 72 F. Supp.3d 738 (W.D. Ky. 2014))." (*Id.*)

Defendants are correct that Plaintiff's speech is not protected simply because he gained knowledge from his employment. However, their reading of *Lane* is overly broad as well. In *Lane* the Court held that, "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech. The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane*, 134 S. Ct. at 2379. "After *Lane*, the *Garcetti* exception to First Amendment protection for speech . . . must be read narrowly as speech that an employee made in

furtherance of the ordinary responsibilities of his employment." *Boulton v. Swanson*, 795 F.3d 526, 534 (2015). Thus the key inquiry here is whether the statements Wolgast made at the public meetings were in furtherance of his ordinary responsibilities.

Moreover, the cases cited by Defendants do not support their line of reasoning. *Evans-Marshall* and *Fox* were decided prior to the Supreme Court's ruling in *Lane*. *Evans-Marshall*, 624 F.3d at 332; *Fox*, 605 F.3d at 345. And in *Pacheco*, the court held that the Plaintiff was speaking as a *private* citizen when she sent a letter to a newspaper regarding school security and discipline of students. 72 F. Supp.3d at 745-46. The only post *Lane* decision cited by Defendants that found that the employee did not speak as a private citizen is *Moss v. Pembroke Pines*, 782 F.3d 613 (11th Cir. 2015). In that case the court held that statements made by an assistant fire chief at a staff meeting were not protected because he attended the meeting as a representative pursuant to his duties, and his comments "were in furtherance of his official responsibility." *Id.* at 619.

Since the November 19 and December 3 meetings were public and Plaintiff commented on the sustainability of the take-home program, teachers' preferences, and the decision-making process, I suggest that there is a genuine issue of material fact as to whether Plaintiff spoke in furtherance of his duties as an employee or as a private citizen. I therefore find that Plaintiff has met the first prong of his *prima facie* case.

Defendants argue that they are entitled to summary judgment because Plaintiff has not met his burden under the second prong of the *Pickering* balancing test. (Doc. 56, at 16-19.) When undertaking the second prong of the *Pickering* balancing test, the Court will "consider whether an employee's comments meaningfully interfere with the performance of [his or] her

duties, undermine a legitimate goal or mission of the employer, create disharmony among co-workers, impair discipline by superiors, or destroy the relationship of loyalty and trust required of confidential employees." *Lewter v. Kannensohn*, 159 Fed. Appx. 641, 646 (6th Cir. 2005); *see also Leary*, 349 F.3d at 900.

As an initial matter, Wolgast argues that a genuine issue of material fact exists as to whether Defendants relied on his December 8 letter in deciding not to renew his contract; therefore, the letter should not be considered under the *Pickering* balancing test. (Doc. 66, at 28.) He points to an exchange of emails between the board members that indicate that Hutchison finalized his decision not to renew Plaintiff's contract before he read the December 8 letter. (Doc. 66, at 6 (citing Doc. 44, Ex. A).) However, the parties do not dispute that Hutchison made the decision not to renew Wolgast's contract before he read Plaintiff's letter. (Doc. 56, at 10; Doc. 66, at 7.) The only dispute is one of characterization. Defendants state that the letter "cemented" Hutchison's "preliminary" decision. (Doc. 56, at 10.) Plaintiff contends that it just "slightly modified" defendant's "finalized" decision. (Doc. 66, at 7.) Either way, Hutchison reviewed the letter prior to taking any adverse action against Plaintiff, and it was a factor in his decision. Thus, Wolgast's argument that the letter may not be considered in weighing Defendant's interests under *Pickering* is meritless.

However, even if the December 8 letter is excluded, the balance of interests still falls in Defendants' favor. "In performing the balancing, the statement(s) will not be considered in a vacuum; the manner, time and place of the employee's expression are relevant, as is the context in which the dispute arose." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987). The statements made by Wolgast at the November 19, December 3, and December 8 meetings

consisted largely of criticism of the take-home laptop project. Superintendent Hutchison described Wolgast as "the most negative person in the room, in tone, posture and words" at all three meetings. (Doc. 56 Ex. K ¶ 8.) Board member Bacarella described plaintiff as "disrespectful" after the December 3 meeting and raised concerns that he would "unconsciously sabotage" the take-home laptop project.[5] (Doc. 56, Ex. JJ.) Plaintiff's statements were directed to or made in the presence of his supervisor, Superintendent Hutchison, who was responsible for tasking him with the implementation of the take-home project. Other supervisors and/or coworkers who regularly interacted with Plaintiff were present at each meeting. Thus, Plaintiff's statements could reasonably raise concerns regarding maintaining discipline by immediate superiors. *See Pickering*, 391 U.S. at 569-70 (raising concerns about statements directed to persons that the plaintiff works with daily).

Moreover, while Plaintiff could certainly raise his concerns, his continued opposition and negativity toward the take-home project, combined with the "crucial" role that he played, as one of only two technology employees responsible for implementing the project, could reasonably raise concerns that he would undermine the one-to-one program. (Doc. 56, at 18.) Particularly relevant is the fact that he expressed negativity towards the program at a meeting where Superintendent Hutchison was informing many employees about the decision for the first time. (*Id.* at 9.) Given Plaintiff's role in the project, Defendants could reasonably assume that his negativity towards it may impact employee outlook on the program, thus undermining

---

[5] Defendants inexplicably do not discuss this email. They focus on Bacarella's testimony that Plaintiff's comments were "demeaning and rude to the superintendent." (Doc. 56, at 7 (citing Ex. D, at 17).) However, as Plaintiff points out Bacarella could not recall specific statements made by Wolgast thus his testimony cannot be relied on to describe what Plaintiff stated. (Doc. 66, at 12.)

the project. Furthermore, although Plaintiff was taking steps to move forward with the project, he made no effort to reassure Superintendent Hutchison or any other District employee that he could place his personal concerns aside and do his best to move forward with the program.[6] Plaintiff admits that he believed the project "was doomed to failure." (*Id.* at 30.) Defendants were not required to continue to employ him such that he could make his prediction a reality. *See Connick v. Myers*, 461 U.S. 138, 151 (1983) ("The Government as an employer, must have wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch.")

Plaintiff raises a number of arguments that his interest in speaking on matters of public concern outweighs Defendants' interests. First, he argues that his comments at the November 19 meeting were not against Defendants' interests because they were made prior to the District's decision to adopt the laptop take-home project. (Doc. 66, at 27.) However, the timing of the decision is irrelevant. Even if the District adopted the laptop project after the November 19 meeting, statements Plaintiff made regarding the program would be relevant under the *Pickering* analysis. Second, Wolgast argues that he merely answered questions at the December 3 meeting and did not raise unique concerns at the December 8 staff meeting. (*Id.* at 27-28.) However, the contents of Plaintiff's speech are not the only relevant factor. Plaintiff's negative tone and continued opposition towards the project, the persons present at each

_____

[6] Plaintiff appears to assert in his response, and has argued in the past (*see* Doc. 61, at 17-18.) that his December 8 letter served as reassurances that he would perform his job responsibilities despite his personal opinions. (Doc. 66, at 30.) However, the December 8 letter, when read in context, is more easily read as a threat or a list of demands than as a reassurance. (*See* Doc. 56, Ex. N.)

meeting, and Plaintiff's role with regard to implementing the project also must be considered in weighing the parties' interests. *See Rankin*, 483 U.S. at 388.

Once all of the above considerations are taken into account, I suggest that Plaintiff is unable to establish a genuine issue of material fact as to the second prong, i.e. whether his "interest in addressing these matters of public concern outweighs the interest of [his or] her employer 'in promoting the efficiency of the public services it performs through its employees.'" *Garcetti,* 547 U.S. at 418 (quoting *Pickering*, 391 U.S. at 568). I therefore suggest that Plaintiff cannot establish his *prima facie* case and that Defendants motion for summary judgment with regard to Plaintiff's First Amendment Claim should be granted.

### c.      *Monell Liability*

Defendants also argue that they are entitled to summary judgment with regard to Plaintiff's First and Fourteenth Amendment claims because Plaintiff has failed to allege that these violations occurred as a result of a custom or policy established by the Board. (Doc. 56.) Although I have addressed the merits of both of these claims, I will also address this defense in the interest of judicial economy.

Local governments and agencies, such as a School Board, may be sued under § 1983 where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers" or is "visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978). The policy or custom must "cause[] an employee to violate another's constitutional rights." *Id.* at 692 (internal quotations omitted).

26

Thus local governments may not be held liable under the doctrine of *respondeat superior* under section 1983. *Id.* at 691. "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694. This extends to employees of a local government or agency sued in their official capacity because "[a] suit against an individual in his official capacity is the equivalent of a suit against the government entity." *Mathews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994).

Thus to satisfy *Monell*, Wolgast must first establish a constitutional violation and second show that the violation was the result of a custom or policy adopted by the School Board. *Monell*, 436 U.S. at 690. The Sixth Circuit has held that to satisfy the second requirement "a plaintiff must 'identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy.'" *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993) (citing *Coogan v. City of Wixom*, 820 F.2s 170, 176 (6th Cir. 1987)).

Defendants argue that Plaintiff has not met the *Monell* requirements because he has presented no evidence of an unlawful policy or custom. (Doc. 56, at 23.) Plaintiff, for the first time in his response (Doc. 66) and partial motion for summary judgement (Doc. 63) alleges that the District had policies of (1) hiring employees to perform administrative or personnel services without contractually defining them as administrators and thereby depriving them of their Fourteenth Amendment due process rights; and (2) retaliating against District employees for speaking out at public meetings. (Doc. 66 at 34-35.) I will address each of these claims in turn.

27

With regard to the alleged policy of depriving administrators of their Fourteenth Amendment rights under M.C.L. § 380.1229, the only evidence Plaintiff presents are the contracts of five District employees which include the following addendum: "The following terms shall supplement the *existing Administrator's* contract language." (Doc. 63, Ex. V (emphasis added).) Thus, plaintiff makes a conclusory argument that because these five employees are referred to as administrators in their contract they must be administrators. (Doc. 63, at 17.)

However, Plaintiff provides no evidence that these five employees were performing the duties of an administrator; nor does he provide evidence that using the term administrator in a contract makes an employee an administrator under M.C.L. § 380.1229. Plaintiff also does not rebut Freel's testimony that three of the employees were not administrators. (Doc. 56, Ex. C, at 47.) Thus, Plaintiff has presented no genuine issue of material fact from which a reasonable juror could conclude that the alleged policy did in fact exist.

Similarly, the alleged "policy of retaliation against employees who openly stated ideas at public meetings different than those espoused by the Superintendent or by Board members" is not supported by the record. (Doc. 66, at 34.). As evidence of this policy of retaliation, Plaintiff alleges that Defendants (1) retaliated against District employee Mochty for statements made in opposition to Hutchison "by bullying her in her office" until she "came around;" and (2) retaliated against Technology Support Specialist Ben Kendra for statements made in opposition to a board member by requesting his attendance at the December 3 meeting so "that the Board could intimidate him as well as have him witness their admitted aggression toward Wolgast." (Doc. 66, at 34-35.) The only citation provided by Wolgast to support this allegation

28

is Defendant Freel's testimony in which she states that while Mochty initially opposed the 1:1 initiative she "apparently came around." (*Id.* (citing Doc. 56, Ex. C, at 20).) However, Freel also testified that she did not know if speaking with Hutchison impacted Mochty's stance on the initiative. (Doc 56, Def. Ex. C, at 26.) Plaintiff's allegations at best can be characterized as speculative, and without any support it is insufficient to meet the requirements of *Monell*.

I suggest that Plaintiff has failed to demonstrate the existence of a policy or practice on the part of Defendant Tawas Area School District Board of Education. Thus, the Board and Defendants Hutchison, Freel, and O'Connor in their official capacities are not liable under Plaintiff's section 1983 claims.

### 2.    State Law Claims

#### a.    *Supplemental Jurisdiction*

Since I recommend that summary judgment be granted as to Wolgast's federal claims over which the court has original jurisdiction under 28 U.S.C. §§ 1331, I further recommend that the court should decline to exercise supplemental jurisdiction over the remaining state law claims. "[D]istrict courts may decline to exercise supplemental jurisdiction over [a state law claim] if the district court has dismissed all claims over which is has original jurisdiction." 28 U.S.C. § 1367(c)(3). The law in this area has been clearly spelled out:

> "A district court has broad discretion in deciding whether to exercise supplemental jurisdiction over state law claims." *Musson Theatrical, Inc. v. Federal Express Corp,*, 89 F.3d 1244, 1254 (6th Cir. 1996) (citation omitted). "When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed." *Id.* at 1254-55 (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7, 98 L. Ed. 2d 720, 108 S. Ct. 614 (1988)); *see also Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 900 (6th Cir. 2001) ("In fact, the usual course is for the district court to dismiss state-law claims without prejudice if all federal claims are disposed of on summary judgment."); *Aschinger v. Columbus Showcase*

29

*Co.*, 934 F.2d 1402, 1412 (6th Cir. 1991) (noting that only "overwhelming interests in judicial economy may allow a district court to properly exercise its discretion and decide a pendent state claim even if the federal claim has been dismissed before trial.").

*Andonian v. Autoalliance Int'l, Inc.* 2003 U.S. Dist. Lexis 26159, at *54-55 (E. D. Mich. Feb. 25, 2003). Thus, I suggest that Wolgast's state law claims should be dismissed without prejudice. In the event that the court should choose to exercise jurisdiction over the state law claims, I will also address the merits of those claims in the alternative.

### b. Alternative Analysis — Merits of State Law Claims

#### i. Michigan Whistleblower Protection Act (WPA) — Count III

Plaintiff alleges that Defendants retaliated against him for reporting potential wrongdoing by deciding not to renew his contract in violation of Michigan's WPA. (Doc. 7 ¶ 104.) Defendants seek summary judgment on this claim. (Doc. 56.) Michigan Compiled Laws section 15.362 provides:

> An employer shall not discharge . . . an employee . . . because the employee reports, or is about to report, verbally or in writing, a violation or suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing or inquiry held by that public body, or a court action.

As Defendants point out, "the non-renewal of a contract is not actionable under the WPA." (Doc. 56, at 26.) In *Wurtz. v. Beecher Metro. Dist.*, 848 N.W.2d 121 (2012), the Michigan Supreme Court held, "as gleaned from the WPA's express language, the statute only applies to individuals who currently have the status of an 'employee.' . . . Noticeably absent . . . is any reference to prospective employees or job applicants" in direct and "stark contrast to Michigan's Civil Rights Act (CRA)." *Id.* at 127-28. Accordingly, the Michigan Court held that

"the WPA does not apply to decisions regarding contract renewal" but would protect "actions taken with respect to an employee's service under such a contract." *Id.* at 129. Since Plaintiff's claim focuses on Defendant's decision not to renew his contract, as a matter of law his claim cannot survive.

Wolgast's only rebuttal is that as an administrator he was entitled to automatic renewal. (Doc. 66, at 33.) However, as previously discussed, Wolgast is not so entitled. Thus, Defendants should be granted summary judgment on Plaintiff's WPA claim.

### ii.   Improper Non-Renewal of Administrator's Contract — Count IV

Both Plaintiff and Defendants seek summary judgment on Plaintiff's claim that Wolgast's rights were violated under M.C.L. § 380.1229(2). As discussed under Plaintiff's Fourteenth Amendment claim, Plaintiff was not an Administrator and therefore was not entitled to protection under § 380.1229(2). Therefore, I suggest that summary judgment be granted in favor of Defendants.

### iii.   Non-renewal of Plaintiff's Contract — Count V

Plaintiff alleges that the decision not to renew his contract was made at a "secret meeting of the Personnel Committee" in violation of M.C.L. § 380.1201, which requires that the board conduct business at public meetings in compliance with the OMA. (Doc. 7 ¶ 111.) Defendants admit that the Board did not make the decision not to renew Plaintiff's contract. (Doc. 56, at 31-32.) Thus, the only issue is whether the Board was required to publicly deliberate and vote on the non-renewal of Plaintiff's contract.

In relevant part, M.C.L. § 390.11a states:

(3) A general powers school district . . . may exercise a power incidental or appropriate to the performance of a function related to operation of the school

31

district in the interests of public elementary and secondary education in the school
district, including, but not limited to, all of the following:

(d) Hiring, contracting for, scheduling, supervising, or terminating employees,
independent contractors, and others to carry out school district powers.

Defendants argue, and Plaintiff does not contest, that the statute requires the Board to make

hiring and termination decisions, but does not require the Board to make the decision "<u>not</u> to

hire an individual." (Doc. 56, at 32.) Defendants state that because Plaintiff was employed for a

specific term and his contract expired by its own terms, Wolgast was merely a "prospective

employee" and the Board was only required to act if they wished to renew Plaintiff's contract.

(*Id.* (citing *Wurtz*, 848 N.W.2d at 125 ("[A]bsent some express obligation stating otherwise, a

contract employee has absolutely no claim to continued employment after his or her contract

expires.")).) Thus, Defendants assert that because Superintendent Hutchison did not

recommend renewal of Plaintiff's contract to the Personnel Committee, the Board was not

required to act or deliberate on the renewal of Plaintiff's contract. (Doc. 56, at 33-34.)

Plaintiff reasserts his argument that as an administrator he was entitled to automatic

renewal. (Doc. 66, at 34.) However, as previously discussed, Plaintiff was not an administrator.

Therefore, Wolgast was not entitled to automatic renewal and Defendants should be granted

summary judgment as to this claim.

### iv.     *Open Meetings Act — Counts VI, VII, & VIII*

Plaintiff alleges that Defendants violated Michigan's OMA by (1) failing to meet and

publicly vote on the decision to adopt the take-home laptop project; (2) failing to meet and

publicly deliberate on the project; and (3) failing to keep minutes at the Board's Standing

Personnel and Technology Committee meetings. (Doc. 7, ¶¶ 113-21.) Plaintiff seeks summary judgment on the second and third claims. Defendants seek summary judgment on each claim.

To resolve a challenge under the OMA a court "must determine (1) whether the agency acts as a 'public body,' (2) whether there is a 'meeting' of the agency, (3) whether a 'decision' effectuating public policy is made by the agency, and (4) whether any exceptions are applicable." *Schmiedicke v. Clare Sch. Bd.*, 228 Mich. App. 259, 261 (1998).

### A.    Failure to Publicly Vote — Count VII

Plaintiff alleges that Defendants violated M.C.L § 380.1201 by deciding to move forward with a one-to-one program without a majority vote. (Doc. 7 ¶ 116.) Defendants argue that the policy of a one-to-one program was properly adopted at a public meeting when the Board approved the $9.7 million dollar bond. (Doc. 56, at 30 (citing Exs. U, V).) The Board minutes from the June 9, 2014 meeting indicate that the Board's financial analysist presented "some limited financial information for the purpose of discussing a possible school building and site bond issue." (Doc. 56, Ex. V, at Pg. ID 1515.) The financial report "include[d] money for technology including one-to-one devices for all students and the infrastructure needed to operate the devices." (Doc. 70, at 11 (citing Doc. 56, Ex. V, at Pg. ID 1515).) On July 7, 2014, the Board publicly voted on a resolution for the bond. (*Id.* (citing Doc. 56, Ex. W, at Pg. ID 1521).) Defendants state that since they voted to adopt the policy of the one-to-one program they then delegated implementation of the policy to Superintendent Hutchison who "had the independent authority to implement and administer the [one-to-one] program, including whether to proceed with a take home aspect." (Doc. 56, at 30-31). They point to District Bylaw and Policy stating that "[a]s chief executive, the superintendent has broad 'latitude to

33

determine the best method of implementing' school programs, administrative policies, procedures, and any other necessary operational decisions." (Doc. 56, at 30 (citing Ex. TT, Bylaw 0132.2; Policy 1210).) They state that the Board's only remaining role was to approve expenditures regarding the implementation of the [one-to-one] initiative, which it did when the Board unanimously voted to approve the purchase of laptops on April 27, 2015. (*Id.* at 31 (citing Ex. EE).)

Plaintiff argues that the Board never voted on the one-to-one program. (Doc. 66, at 31-32.) He points to the plain language of the bond, which does not mention a one-to-one policy. (*Id.* (citing Doc. 63, Ex. X, at 2368).) The Bond states that the funds will be used for the purpose of "acquiring, installing and equipping instructional technology for school district buildings, together with related infrastructure improvements." (Doc. 70, Ex. FFF, at Pg. ID 2720.) He also points to emails between Board members and Superintendent Hutchison, which raise questions as to when the decision to adopt the one-to-one program was made. (Doc. 63, at 21, 23-26.) For instance, on November 6, 2014 after the bond had been approved by voters, Freel wrote, "*If* we're going to implement one to one we need to use the technology completely. . . ." (Doc. 66, Ex. X, at Pg. ID 2370 (emphasis added).)

Defendants assert that the bond language combined with the financial analysist report at the public meeting on June 9, 2014, indicates that the Board in fact adopted the one-to-one policy. (Doc. 70, at 11.) However, I suggest that Plaintiff has presented a genuine issue of material fact as to whether the board actually did adopt such a policy. Therefore, I suggest that Defendants motion for summary judgment should be denied as to this claim.

B.      Failure to Publicly Deliberate — Count VI

34

Plaintiff alleges that the Standing Technology Committee violated the OMA by deliberating and deciding the devices to provide, the costs of various programs, and the timeline for implementation in a closed session. (Doc. 63, at 31-32.) He argues that these decisions were matters of public policy; thus the Board was required to publicly deliberate on these issues. (*Id.* at 30-31.) Defendants admit that the Technology Committee met and discussed the laptop take-home project. (Doc. 56, at 31.) However, they allege that the Board was not required to publicly deliberate on the project because the Board delegated implementation to the Superintendent. (*Id.*)

As previously discussed, a genuine issue of material fact exists as to whether the board adopted the one-to-one policy. Therefore, a material issue of genuine fact exists as to whether the Technology Committee and Superintendent Hutchison improperly deliberated on the one-to-one program. I suggest that both Plaintiff and Defendants motions for summary judgment should be denied as to this claim.

### C.    Failure to Keep Minutes — Count VIII

M.C.L. § 15.269(1) requires public bodies to keep minutes of each meeting. Defendants do not deny that the Board's Standing Personnel and Technology Committees did not take minutes. They allege that they were not required to take minutes because they are not public bodies, but are purely advisory committees. (Doc 56, at 34-35.)

Two requirements must be met for an entity to qualify as a public body under Michigan's OMA:

> First, the entity at issue must be a 'state or local legislative or governing body, including a board, commission, committee, subcommittee, authority, or council.' Second, the entity must be 'empowered . . . to exercise governmental or proprietary authority or perform a governmental or proprietary function,' and that

power must derive from 'state constitution, statute, charter, ordinance, resolution, or rule.'

*Herald Co. v. City of Bay City*, 463 Mich. 111, 129 (2000) (citing M.C.L. § 15.262(a)).

The Michigan Court of Appeals has defined a legislative body under the OMA as an entity with "the power to make or enact law, to bring something into or out of existence by making law, or to attempt to bring about or control by legislation." *Davis v. City of Detroit Financial Review Team*, 296 Mich. App. 568, 592-93 (Mich. App. 2012). Clearly the Board's standing committees are not legislative bodies. A governing body has been defined by the legislature as "a body that has some specific authority over a political subdivision: a board of commissioners for a county, a city or village council, a township board, a body with legislative powers, or any body that has general governing or policymaking authority over a political subdivision." *Id.* at 594 (citations omitted). Consequently, the key question is what "authority" or "function" the Personnel and Technology Committees were empowered to exercise or perform. *Id.* at 594. The focus of this inquiry is the "authority *delegated* to [the entity], not the authority it *exercised*." *Id.*

> The Board's authority to create standing committees arises from District Bylaw 0155:
>
> Committees of Board members shall perform the duties as assigned by the Board, which may include deliberating, making decisions/recommendations or taking other actions specifically authorized by the Board. All committees shall comply with the Open Meetings Act in accordance with the applicable requirements set forth in 0160 Bylaws.

(Doc. 56, Ex. TT, at Pg. ID 1613.) District Bylaw 0168.3 provides that:

> "Any Board Committee, . . . which exercises governmental or proprietary authority must comply with the Open meetings provisions. . . . Committees that are empowered to take action, make recommendations or otherwise deliberate *in place of the Board* are subject to this requirement."

36

(*Id.* at Pg. ID 1623 (emphasis added).)

Defendants argue that the Technology and Personnel Committees were merely "advisory and investigatory" committees, "submitting recommendations, and not decisions to the Board for approval. (*Id.* at 34-35 (citing Exs. D, at 15, 17, 19; U, W, Z, AA).) They state that the Committees were not empowered to exercise governmental or proprietary authority, or in other words to make recommendations "in place of the board." (*Id.*)

Plaintiff contends that District Bylaw 0168.3 stands for the proposition that the act of making a recommendation to a public body alone constitutes the exercise of governmental or proprietary authority. (Doc. 63, at 28-29.) He points the court to *Schmiedicke v. Clare School Bd.*, 228 Mich. App. 259 (1998) in support of his position. However, his reading of the Bylaws and *Schmiedicke* is inapposite. In *Schmiedicke*, a school board delegated to a committee "the task of reviewing whether the school district should retain its current method for evaluating school administrators and whether the length of administrator contracts should be changed." *Id.* at 260. After meeting, the committee recommended no change, and the board adopted that recommendation without taking any action. *Id.* The court, without any analysis of the issue, found that the committee was a public body. *Id* at 262. It then held that the school board delegated a government function to the committee because the committee made a decision and the board accepted it without acting on it. *Id.* at 263-64. Thus, under *Schmiedicke* an entity empowered to make a decision or recommendation on behalf of a public body has been delegated authority to perform a governmental function.

District Bylaw 0168.3 states that committees "empowered to make recommendations . . . *in place of the Board* are subject to" to the OMA. (*Id.* at Pg. ID 1623 (emphasis added).)

Thus, using the reasoning from *Schmiedicke,* it follows that an entity only empowered to make recommendations to a public body is not subject to the OMA. *See also Edwards v. Oakland Twp.*, 2015 WL 1277009, at *9 (March 19, 2015).

With regard to the Personnel Committee, Plaintiff admits that the Committee was responsible for preparing recommendations to the Board regarding the renewal of various administrative contracts. (Doc. 63, at 27.) He further admits that those recommendations were submitted to the Board and the Board acted on those recommendations. (*Id.*) Thus, Plaintiff has presented no evidence that the Personnel Committee was empowered to make recommendations in the Board's place. Thus, I suggest that the Board did not delegate governmental or proprietary authority or a governmental or proprietary function to the Personnel Committee.

With regard to the Standing Technology Committee, Defendants assert that they did not delegate any authority to the Committee and it only convened to assist Superintendent Hutchison in implementing the take-home policy. (Doc. 56, at 31.) However, a genuine issue of material fact exists as to whether Defendants in fact adopted that policy. Moreover, as Plaintiff points out, on December 8 the Technology Committee presented a report on the one-to-one project. (Doc. 63, at 34.) The Board did not act on this report but moved forward with the one-to-one program. (*Id.*) Consequently, I suggest that a material issue of genuine fact exists as to what authority was delegated to the Standing Technology Committee.

### D.   Individual Defendants

In Defendants' response they argue that Plaintiff's motion for summary judgment should not be granted because he has not presented any evidence that they intentionally

38

violated the OMA and the Superintendent is not a member of a public body." (Doc. 68, at 26-27.) M.C.L § 12.273(1) creates personal liability for public officials "who intentionally violate" the act. For an individual to be liable under the OMA Plaintiff must show: "(1) the defendant is a member of a public body, (2) the defendant actually violated the OMA in some fashion, and (3) the defendant intended to violate the OMA." *Ritchie v. Coldwater Comm. Schs.*, 2015 WL 2862037, at *21 (W.D. Mich. July 11, 2012).

An intentional violation of the OMA requires evidence of a "subjective desire to violate the OMA or knowledge that the offender is committing an act violating the OMA." *Id.* at *22 (citing *People v. Whitney*, 228 Mich. App. 230, 255-56 (1998)). Wolgast does not specifically allege that Superintendent Hutchison, President Freel, or Vice-President O'Connor knowingly violated the OMA. (Doc. 7; Doc. 63.) However, accepting Wolgast's contention that the decision to implement the take-home policy was made via email as true, the Court cannot conclude that Defendants, given their roles within the school board, did not know they were violating the OMA.

Defendants next argue that Superintendent Hutchison is not liable because he was not a member of the School Board or the Personnel and Technology Committees for purposes of § 12.273. They cite *Ritchie v. Coldwater Comm. Schs.*, 2015 WL 2862037 (W.D. Mich. July 11, 2012), stating that the court held that a Superintendent is not directly liable under Section 13 of the OMA because he is not a member of a public body. However, in *Ritchie* the OMA claim dealt only with a violation by the school board, and not by a subcommittee of the board. Here, a genuine issue of material fact exists as to whether the Board's Standing Technology

Committee acted as a public body. Thus if Hutchison was a member of the Technology Committee he may be liable under the OMA.

Under District Bylaw 0155 the Superintendent serves "as an ex-officio member of each committee." (Doc. 56, Ex. TT, at Pg. ID 1613.) Ex officio is defined in Black's Law Dictionary:

> By virtue or because of an office; by virtue of the authority implied by office. The term is often misused as a synonym for "nonvoting." Some meetings mistakenly label their regularly invited guests as "ex officio members" when in fact they are not members at all; others mistakenly refer to the nonvoting members as "ex officio members" even though some nonvoting members are present only in an individual capacity and not by virtue of office, or even though some voting members also serve ex officio. But an ex officio member is a voting member unless the applicable governing document provides otherwise.

*Ex Officio*, BLACK'S LAW DICTIONARY (10th ed. 2014). It is not clear from the facts presented what role Hutchison played in the Standing Technology Committee. Defendants have provided no evidence regarding his authority to act as part of the Committee. Therefore, I find that a genuine issue of material fact exists as to whether Hutchison was a member of a public body.

### 3. *Plaintiff's Motion for Leave to File Newly Discovered Evidence – Doc. 73*

The evidence Plaintiff seeks to submit is a newspaper article from October 22, 2014. (Doc. 73, at 1.) Defendants point out that evidence is only newly discovered when it was previously unavailable. (Doc. 74, at 1 (citing *GenCorp v. American Intern. Underwriters,* 178 F.3d 804, 834 (6th Cir. 1999)).) In addition, a party seeking to submit newly discovered evidence must exercise due diligence in attempting to obtain that evidence. (*Id.* (citing *Good v. Ohio Edison Co.*, 149 F.3d 413, 423 (6th Cir. 1999)).) Newspaper articles are public records. *Dusenbery v. U.S.*, 2012 WL 1029460, at *5 (N.D. Ohio March 26, 2012); *Brayboy v. Napel*,

40

2012 WL 37395, at *6 (E.D. Mich. Jan. 9, 2012). Plaintiff has not made any argument as to why he could not have discovered an article, which is available online, at an earlier date. (Doc. 73; Doc. 74, at 1.) He also made no attempt to demonstrate that he exercised due diligence in searching for this article. (Doc. 73). Thus, I suggest that Plaintiff's motion should be denied.

### C. Conclusion

For all of the reasons above, I suggest that Defendants' motion for summary judgment (Doc. 56) should be **GRANTED** as to Counts I and II with prejudice, and that the state law claims in Counts III, IV, V, VI, VII and VIII be dismissed without prejudice. Alternatively, if the court does not dismiss the state law claims, I suggest that Defendants' motion be granted as to Counts III, IV, V, and VIII as to allegations regarding the Personnel Committee, and denied as to Counts VI, VII, and VIII as to allegations regarding the Standing Technology Committee.

I further suggest that Plaintiff's motion for Partial Summary Judgment (Doc. 63) should be **DENIED**, and that Plaintiff's motion to file newly discovered evidence (Doc. 73) should also be **DENIED.**

### III. <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United*

*States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(2)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  December 23, 2015                S/ PATRICIA T. MORRIS
                                        Patricia T. Morris
                                        United States Magistrate Judge

## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record and Plaintiff who is a pro se e-filer.

Date: December 23, 2015                 By s/Kristen Krawczyk
                                        Case Manager to Magistrate Judge Morris